**ALLIANCE TO END REPRESSION, et al., Plaintiffs,**

**v.**

**CITY OF CHICAGO, et al., Defendants.**

**AMERICAN CIVIL LIBERTIES UNION, et al., Plaintiffs,**

**v.**

**CITY OF CHICAGO, et al., Defendants.**

Nos. 74 C 3268, 75 C 3295.

United States District Court, N.D. Illinois, E.D.

March 30, 1982.

Agreed Order, Judgment and Decree April 8, 1982.

Robert C. Howard, Matthew J. Piers, Douglas W. Cassel, Alexander L. Polikoff, Robert J. Vollen, Robert L. Tucker, Chicago, Ill., for ACLU plaintiffs.

Richard M. Gutman, Lance Haddix, Chicago, Ill., for Alliance plaintiffs.

Stanley Garber, Peter Fitzpatrick, Chicago, Ill., for City of Chicago defendants.

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Preliminary Statement of Principles | 559 |
| Constitutional Protection of Individual Rights | 560 |
| The Importance of Effective Law Enforcement | 560 |
| City Policies Concerning First Amendment Conduct | 560 |
| I. Permanent Injunction | 561 |
|   1. The Scope of this Judgment; Definitions | 561 |
|     1.1 Applies Only to Investigation Directed Towards First Amendment Conduct; Great Majority of Police Activity Not Affected by this Judgment | 561 |
|     1.2 "Investigative Activity" | 561 |
|     1.3 "Directed Toward" | 561 |
|     1.4 "Incidental References" | 562 |
|     1.5 "First Amendment Conduct" | 562 |
|   2. Prohibitions that Apply to All Agencies of the City of Chicago | 562 |
|   3. Police Department Investigations | 563 |
|     3.1 Basic Procedures for Investigations | 563 |
|       3.1.1 Avoidance of First Amendment Information | 563 |
|       3.1.2 Minimization | 563 |
|       3.1.3 Intrusive Methods | 563 |
|       3.1.4 Authorization | 563 |
|       3.1.5 Termination | 563 |
|       3.1.6 Security | 563 |
|       3.1.7 Purging | 564 |
|     3.2 Criminal Investigations Directed Toward First Amendment Conduct | 564 |
|     3.3 Dignitary Protection Investigations | 565 |
|     3.4 Public Gathering Investigations | 565 |
|     3.5 Regulatory Investigations | 566 |
|     3.6 Intrusive Methods | 567 |
|   4. Implementation of this Judgment | 568 |
|   5. Auditing Implementation and Compliance with this Judgment | 568 |
|   6. Index to Definitions | 569 |
| II. Retention of Jurisdiction and Ancillary Matters | 570 |
|   A. Retention of Jurisdiction | 570 |
|   B. Final Disposition of Claims for Injunctive Relief Against City Defendants | 570 |
|   C. Ancillary Matters | 570 |

\* Appendices I, II and III have been omitted from publication with the consent of the Court. The Appendices are filed in the Office of the Clerk

**FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING SETTLEMENT AGREEMENTS WITH THE CITY OF CHICAGO AND THE SECRETARY OF DEFENSE**

GETZENDANNER, District Judge.

These proposed findings of fact and conclusions of law are submitted jointly on behalf of the plaintiff proponents of two settlement agreements entered into between all named plaintiffs in the *ACLU* case, certain named plaintiffs in the *Alliance* case (hereinafter "the participating *Alliance* plaintiffs"), and certain defendants in both cases. One settlement agreement is with the City of Chicago and certain of its employees (hereinafter "the City of Chicago defendants") identified in Appendix C to the Agreed Order, Judgment and Decree embodying that settlement which was filed with the Court on June 12, 1981 and a copy of which is attached hereto as Appendix I (hereinafter the "City of Chicago Settlement").\* The other settlement agreement is with defendants the Secretary of Defense, Richard Norusis, Thomas Filkins, and Gerald Borman (hereinafter "the Department of Defense defendants"). The proposed settlement with the Department of Defense defendants is embodied in a Joint Motion and Stipulation which was filed with the Court on July 2, 1981, and a copy of which is attached hereto as Appendix II (hereinafter the "Department of Defense Settlement").\* The identity of the *Alliance* plaintiffs who join in the proposed settlements is shown on Appendix A to the City of Chicago Settlement and on Exhibit A to the Department of Defense Settlement. The City of Chicago defendants and the Department of Defense defendants are sometimes hereinafter referred to collectively as "the settling defendants."

## I. FINDINGS OF FACT

### A. The Cases

1. *Alliance to End Repression ("Alliance"), et al. v. City of Chicago, et al.,* No.

of the United States District Court for the Northern District of Illinois.

74 C 3268, was filed as a class action on November 13, 1974. *American Civil Liberties Union ("ACLU"), et al. v. City of Chicago, et al.,* No. 75 C 3295, was filed as a class action on October 3, 1975.

### B. *Parties*

2. The 32 *Alliance* named plaintiffs, 14 of which are organizations and 18 of whom are individuals, include churches, political groups, civil liberties organizations, and individual political, community, and religious activists.

3. Initial *Alliance* defendants included officials and employees of the City of Chicago and the Chicago Police Department. The City of Chicago was added as an *Alliance* defendant on November 19, 1979.

4. On July 8, 1977, *Alliance* plaintiffs added as defendants, in their official capacities only, certain federal officials, including the Attorney General, the Director of the Federal Bureau of Investigation ("FBI"), the Director of the Central Intelligence Agency ("CIA"), and the Secretary of Defense. On January 28, 1980, *Alliance* plaintiffs added as defendants the United States Department of Justice, the FBI, and the CIA.

5. The 24 *ACLU* named plaintiffs, 10 of which are organizations and 14 of whom are individuals, include community groups, religious groups, civil rights and civil liberties groups, and individual community and political activists, lawyers, journalists and public officials.

6. Initial *ACLU* defendants included the City of Chicago and various city officials, the Attorney General of the United States and various FBI officials, and the Department of Defense defendants.

7. On December 27, 1979, *ACLU* plaintiffs added as defendants the United States Department of Justice and the FBI.

8. On August 11, 1981, this Court 91 F.R.D. 182 approved a settlement of all claims against the federal defendants in both cases except claims against the Department of Defense defendants.

### C. *Jurisdiction*

9. Jurisdiction in these cases is asserted on the basis of 28 U.S.C. §§ 1331 and 1343, 18 U.S.C. § 2520, and 5 U.S.C. § 552a; and declaratory relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

### D. *Claims*

10. Plaintiffs in both cases claim that the settling defendants have conducted surveillance of, and compiled dossiers on, plaintiffs' lawful political and other lawful activities; gathered information about plaintiffs by unlawful means, including warrantless wiretaps and break-ins, unlawful use of infiltrators and informers, and by other unlawful means; disrupted and harassed plaintiffs' lawful activities; and that defendants have committed these alleged wrongs against members of the plaintiff classes, all as part of a continuing course and pattern of alleged illegal conduct.

11. Plaintiffs claim that this alleged conduct violates their rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, 18 U.S.C. §§ 2510–20, and 5 U.S.C. § 552a.

12. The relief asked for on behalf of the named plaintiffs and plaintiff classes in both cases includes a declaration by the court that the conduct complained of is unconstitutional, and an injunction prohibiting the continuation of such conduct.

13. No damages are sought on behalf of the plaintiff classes in either case. The named plaintiffs ask for monetary damages against certain of the defendants.

14. In both lawsuits the settling defendants denied all allegations of unlawful government intrusions. Except as noted in the following paragraph, no findings of fact have been made by the Court relating to the allegations made against any of the defendants.

15. In connection with motions for sanctions to compel discovery in the *Alliance* case, the Court held that the plaintiffs had made a *prima facie* showing as to certain material allegations in the complaint against the City of Chicago defendants, and

that these defendants had the burden of showing that they had not engaged in the activities described therein.

### E. *History of Litigation*

16. Both cases have been actively litigated and sharply contested throughout the years since they were filed.

17. The City of Chicago defendants' motion to strike and dismiss the complaint in the *Alliance* case was denied May 16, 1975. 407 F.Supp. 115 (N.D.Ill.). The motion of defendants Mayor of Chicago and Chicago Police Board to dismiss the *Alliance* plaintiffs' First Amended Complaint was denied on September 12, 1975. The motion of defendants Rochford, Ware and Murphy to strike certain paragraphs of *Alliance* plaintiffs' First Amended Complaint was denied on September 12, 1975. The City of Chicago defendants' motion to strike paragraph 84 of *Alliance* plaintiffs' First Amended Complaint was denied on March 31, 1976. The motion to strike and dismiss the *Alliance* plaintiffs' First Amended Complaint as to 70 named Chicago Police defendants was denied on November 10, 1976. Defendant City of Chicago's motion to dismiss *Alliance* plaintiffs' Second Amended Complaint was denied on October 15, 1980.

18. A motion to dismiss by the City of Chicago defendants in the *ACLU* case was denied on May 26, 1976. 431. F.Supp. 25 (N.D.Ill.1976). A motion by the City of Chicago to reconsider that denial was denied on October 1, 1976.

19. A motion by the Department of Defense defendants to dismiss the complaint in the *Alliance* case was denied November 15, 1977.

20. A motion to dismiss by the Department of Defense defendants in the *ACLU* case was denied May 26, 1976.

21. On March 25, 1976, the Court certified the following two plaintiff cases in the *Alliance* case:

(a) The plaintiff individuals.

The class represented by plaintiff individuals consists of all residents of the City of Chicago, and all other persons who are physically present within the City of Chica-go for regular or irregular periods of time, who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

(b) The plaintiff organizations.

The class represented by plaintiff organizations consists of all organizations located or operating in the City of Chicago who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

22. On May 24, 1976, the Court certified the following two plaintiff classes in the *ACLU* case:

(a) The plaintiff individuals.

The class represented by plaintiff individuals consists of all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents.

(b) Plaintiff organizations.

The class represented by plaintiff organizations consists of all organizations located or operating in the City of Chicago who engage or have engaged in lawful political,

religious, educational or social activities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents.

23. On appeal by the Department of Defense defendants and defendant City of Chicago, the class certifications in both cases were affirmed by the Court of Appeals for the Seventh Circuit on November 22, 1977, and petitions for rehearing and rehearing *en banc* by the Department of Defense defendants were denied February 13, 1978. 565 F.2d 975 (7th Cir.1978).

24. The *Alliance* and *ACLU* cases were consolidated for discovery purposes on July 2, 1976, and both cases were consolidated for discovery purposes on December 8, 1976 with *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. City of Chicago, et al.,* No. 76 C 1982, which is not a class action, and which does not involve the federal defendants or the proposed settlements.[1]

25. On November 10, 1976, the *Alliance* plaintiffs obtained a preliminary injunction against the City of Chicago defendants' surveillance of plaintiffs' legal team. 75 F.R.D. 435 (N.D.Ill.1976), 558 F.2d 1031 (7th Cir.1977), *cert. denied,* 434 U.S. 828, 98 S.Ct. 108, 54 L.Ed.2d 87 (1977).

### F. Discovery Against City of Chicago Defendants

26. Many of plaintiffs' early discovery requests were vigorously resisted by the City of Chicago defendants on several grounds, principally relevance, opposition to classwide discovery, burden of the discovery, the informer's privilege, and "governmental privilege." On November 10, 1976, the *Alliance* plaintiffs obtained the previously described *prima facie* findings of fact as discovery sanctions.

27. Plaintiffs' discovery requests ultimately resulted in production of massive discovery concerning intelligence activities

by the City of Chicago. On July 1, 1976, plaintiffs obtained a court order, further expanded on October 14, 1976, allowing them to copy all index cards of the Chicago Police Department Intelligence Division other than those concerning organized crime, and allowing them to release documents to the named subjects thereof. On May 4, 1977, plaintiffs obtained a court order establishing a depository for their access to approximately 500,000 pages of undeleted pre-1976 files and index systems of the Chicago Police Department Intelligence Division Subversive Unit (commonly known as the Red Squad) and the Gang Intelligence Unit. Plaintiffs have analyzed tens of thousands of these documents. Since September, 1977, plaintiffs have also engaged in periodic review of all current Intelligence Division administrative and "Terrorist Squad" documents, and have obtained copies of many of those which do not concern ongoing criminal investigations. All of the files reviewed and received by the plaintiffs were undeleted.

28. Plaintiffs have also obtained numerous interrogatory answers and taken approximately 100 depositions of Chicago Police Department intelligence agents and officers, as well as other police officials and relevant witnesses. They have further reviewed documents other than those generated by the Intelligence Division such as the files of other Chicago Police Department sections, including the Neighborhood Relations Division, the Beat Representative Program, and the Special Operations Group; the City of Chicago Department of Investigations; the audits and papers of a Mayor's "blue ribbon" commission to investigate police intelligence practices (the Policy Review Commission); the Chicago Police Department Liaison File of the Federal Bureau of Investigation; and the index/identification cards of the Law Enforcement Intelligence Unit. Under a protective order dated October 14, 1976, plaintiffs have released thousands of Chicago Police Depart-

---

1. The *Chicago Lawyers' Committee* case was settled earlier this year, at the same time the named plaintiffs agreed to the settlement agreement with the City of Chicago subject to the Court's approval on behalf of the plaintiff classes.

ment Subversive Unit documents to the subjects thereof.

### G. *Discovery Against Department of Defense Defendants*

29. As part of pretrial discovery, plaintiffs received hundreds of pages of Department of Defense documents, including the following:

(a) Department of Defense domestic intelligence reports in the files of the Chicago Police Department Intelligence Division Subversive Unit;

(b) Department of Defense domestic intelligence reports in the files of the Federal Bureau of Investigation; and

(c) Department of Defense domestic intelligence reports regarding four of the named plaintiffs obtained directly from the Department of Defense. Reports concerning one named plaintiff consisting of a background investigation pursuant to that named plaintiff's induction into the United States Army. The Department of Defense defendants state that reports concerning the three other named plaintiffs are currently being maintained only for purposes of continuing litigation and will be destroyed at the conclusion of the litigation.

30. In response to plaintiffs' interrogatories and document requests, representatives of the Secretary of Defense have stated that except for documents currently being maintained solely for purposes of pending litigation, all Department of Defense domestic intelligence files relating to persons not affiliated with the Department of Defense have been destroyed. During pretrial discovery, plaintiffs did not receive any Department of Defense domestic intelligence files or records which originated after the year 1971.

31. With respect to class discovery, the Department of Defense defendants vigorously resisted plaintiffs' efforts to conduct discovery on behalf of the certified plaintiff classes. The Department of Defense defendants relied in part on the informer's privilege, which was litigated extensively in connection with discovery requests directed to other federal defendants (Memorandum

Opinion and Order of August 11, 1981 at pp. 8–9); and in part on the state secrets privilege. Objections based on the state secrets privilege were overruled by this Court (Memorandum Opinion and Order of March 28, 1978, at pp. 3–4), were initially sustained by the Court of Appeals for the Seventh Circuit, *American Civil Liberties Union v. Brown,* 609 F.2d 277 (7th Cir.1979), and, after rehearing *en banc* by the Court of Appeals, were remanded in part for further determinations by this Court, *American Civil Liberties Union v. Brown,* 619 F.2d 1170 (7th Cir.1980).

### H. *Other Information*

32. In evaluating the desirability of the proposed settlement with the Department of Defense defendants, plaintiffs had access to a large number of Executive Branch, Department of Defense, and military service regulations and directives issued since 1970 purporting to restrict or prohibit domestic intelligence activities by Department of Defense agencies, and purporting to prohibit or restrict acquisition, storage and dissemination of information by such agencies about non-Department of Defense personnel. These Executive Orders, Department of Defense directives, and military service regulations and policy letters purport to establish a comprehensive set of prohibitions and restrictions on the acquisition, storage or dissemination of intelligence information concerning persons not affiliated with the Department of Defense, and purport to establish enforcement responsibilities and procedures both within and without the Department of Defense to enforce these prohibitions and restrictions. Representatives of the Secretary of Defense assert that these restrictions and prohibitions are currently being enforced within the Department of Defense.

33. In negotiating and deciding whether to enter into the proposed settlement with the Department of Defense defendants, plaintiffs have also had the benefit of information concerning military domestic intelligence policies and practices, including military intelligence files and record systems, from extensive Congressional hearings and

reports. *See, e.g.,* "Army Surveillance of Civilians: A Documentary Analysis," by the Staff of the Subcommittee on Constitutional Rights, Committee on the Judiciary, United States Senate, 92d Cong., 2d Sess. (Committee Print, 1972); Hearings on Military Surveillance Before the Subcommittee on Constitutional Rights of the Committee of the Judiciary, United States Senate, (93d Cong., 2d Sess., April 9–10, 1974); Final Report of the Select Committee to Study Governmental Operations With Respect to Intelligence Activities, United States Senate, (94th Cong., 2d Sess., Report No. 94–755, April 23, 1976), particularly the chapter entitled "Improper Surveillance of Private Citizens By The Military," Book III, pp. 785–834.

I. *The City of Chicago Settlement*

34. The City of Chicago Settlement contains specific agreements with respect to future activities of the City of Chicago which would for the first time specifically prohibit political spying and harassment by the City. Because of the importance of these specific agreements, the Court has attached to this Memorandum Opinion and Order, as Appendix I, a copy of the City of Chicago Settlement.

35. The City of Chicago Settlement would terminate all injunctive claims that plaintiffs have asserted in these actions against the City of Chicago defendants.

36. The proposed City of Chicago Settlement is the result of a negotiating process described at the fairness hearing by counsel for both sides as arduous and adversary, and lasting over two years, in which counsel for all plaintiffs and for all City of Chicago defendants participated.

37. Counsel for all parties agree that nearly every line and paragraph of the City of Chicago Settlement, and in many cases individual words, are the product of vigorous negotiations, and that the agreements reflect concessions by all parties.

38. There is no evidence that the negotiations were other than adverse. On the contrary, the whole history of these lawsuits is one of vigorous, hotly-contested litigation. Extensive discovery and trial preparation continued throughout the period of negotiations. At two points in the last year of negotiations, impasses between counsel were reached and negotiations broke off for significant periods of time.

39. The City of Chicago Settlement was entered into after sufficient facts were developed, through discovery and investigation, fairly to apprise all parties of the facts likely to be adduced at trial and to enable them fairly to assess the likely outcome of trial. Massive pretrial discovery was substantially complete, and pursuant to court order plaintiffs and defendants had completed and filed separate draft final pretrial materials.

40. Counsel for the participating parties state that the City of Chicago Settlement negotiated by them in their considered opinion, is fair, reasonable and adequate.

41. The City of Chicago Settlement was approved by all *ACLU* named plaintiffs, and by all *Alliance* named plaintiffs except two organizations and three individuals. These five objected to the settlement and are hereafter referred to as the non-participating *Alliance* plaintiffs.

42. The City of Chicago Settlement has also been approved by the City of Chicago and the Corporation Counsel of the City of Chicago, and has been consented to by the other City of Chicago defendants through their counsel.

43. It is likely that further litigation, absent the proposed settlement, would be extremely complex, lengthy and expensive.

J. *The Department of Defense Settlement*

44. The Department of Defense Settlement contains specific agreements with respect to future domestic intelligence activities by Department of Defense intelligence units and agencies in the City of Chicago. Because of the importance of the Department of Defense Settlement, the Court has attached it to this Memorandum Opinion and Order as Appendix II.

45. Settlement discussions between the plaintiffs and Department of Defense de-

fendants began in August of 1979 and continued until June of 1981, when final approval of all participating parties was obtained. During that nearly two year period, counsel for the parties engaged in extended, adversarial negotiations on virtually every term of the proposed settlement. In addition to the internal Executive Branch regulations which had already been issued relating to domestic intelligence activities by the military, plaintiffs' attorneys considered the difficult legal precedents which would have to be distinguished in order to achieve success at a trial on the merits. *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *American Civil Liberties Union v. Laird,* 463 F:2d 499 (7th Cir.1972). Plaintiffs' counsel also considered the results of Congressional investigations of military domestic intelligence activities, which indicated that little evidence of post-1971 military intelligence activities directed against civilians was likely to be found in Department of Defense files and records.

46. Counsel for the Department of Defense defendants, for the *ACLU* plaintiffs, and for the participating *Alliance* plaintiffs have informed the Court that in their judgments the Department of Defense Settlement is a fair, reasonable and adequate resolution of the claims of the named plaintiffs and the plaintiff classes. That settlement has been approved by all *ACLU* named plaintiffs and by all *Alliance* named plaintiffs except the non-participating *Alliance* plaintiffs. The settlement has also been approved at all appropriate levels of the Department of Defense and the Department of Justice, a process which required many months to complete.

47. It is likely that further litigation of the plaintiffs' claims against the Department of Defense defendants would be extremely complex, lengthy and expensive.

K. *The Preliminary Hearing Concerning The City of Chicago Settlement*

48. In June, 1981, the plaintiff proponents of the City of Chicago Settlement moved to have the Court establish procedures for approval of that settlement. On June 12 and 15, 1981, the Court held a preliminary hearing on the proposed City of Chicago Settlement, and found in its Order of June 15 that the proposed settlement was within the range of possible approval and that there was probable cause to notify members of the plaintiff classes of the proposed settlements pursuant to Rule 23(e), Federal Rules of Civil Procedure, and to hold a fairness hearing.

49. At the preliminary hearing, the Court heard from counsel for the proponents of the settlement. The Court also heard from counsel for three of the non-participating *Alliance* plaintiffs. The Court found that the form of notice to class members, which also included statements from the non-participating . plaintiffs, was fair, reasonable and adequate, directed that notice be given in a prescribed manner, and scheduled a fairness hearing for October 9, 1981. The form of notice to class members of both the City of Chicago and the Department of Defense Settlements which was approved by the Court is attached to this Memorandum Opinion and Order as Appendix III.**

L. *Preliminary Hearing Concerning the DOD Settlement*

50. ·On July 2, 1981 proponents of the Department of Defense settlement jointly moved the Court to establish procedures for consideration of the fairness, reasonableness and adequacy of the settlement with the Department of Defense defendants. On July 6, 1981 the Court held a preliminary hearing on the proposed Department of Defense Settlement and found in its Order of July 6, 1981 that the proposed settlement was within the range of possible approval, and that there was probable cause to notify members of the plaintiff classes of the proposed settlements pursuant to Rule 23(e), Federal Rules of Civil Procedure, and to hold a hearing to determine the fairness,

---

** Appendices I, II and III have been omitted from publication with the consent of the Court. The Appendices are filed in the Office of the Clerk of the United States District Court for the Northern District of Illinois.

reasonableness and adequacy of the proposed settlement.

51. Prior to the July 6 preliminary hearing, the court reviewed the proposed Department of Defense Settlement and the proposed form of notice to class members, which included the statement of the nonparticipating *Alliance* named plaintiffs in opposition to the proposed Department of Defense Settlement.

52. At the preliminary hearing the Court heard from counsel for the proponents of the Department of Defense Settlement. The Court found that the form of notice to class members was fair and adequate, directed that notice by mail and by publication be given to members of the plaintiff classes in a prescribed manner, and scheduled a hearing for October 9, 1981 on the fairness, reasonableness and adequacy of the proposed settlement (see Appendix III to this Memorandum Opinion and Order).

### M. *Notice to Class Members*

53. On July 6, 1981 the Court ordered that individual notice of the City of Chicago and Department of Defense Settlements be given by first class mail not later than August 10, 1981 to all members of the plaintiff classes who could be identified and located through reasonable effort. Specifically, the Court required the following:

(a) Individual notice by first class mail to each organization and person in the City of Chicago on which or whom the defendants maintain or had maintained intelligence files which had been produced during discovery in these actions, and whose current addresses were known to the plaintiffs;

(b) Individual notice to members of organizations described in (a) above, to be accomplished by requesting the officers or other responsible persons in the organization to notify the organization's members of the terms of the Settlements;

(c) Individual notice by first class mail to all other members of the plaintiff classes whose names and current addresses were known to the named plaintiffs or their attorneys; and

(d) Reasonable additional efforts to identify, locate and individually notify by first class mail members of the plaintiff classes not notified, nor reasonably likely to be notified, by the efforts made pursuant to (a), (b) and (c) above.

54. The Court found that notice by publication was the most reasonable form of notice to those class members who were not notified by the efforts described above, and ordered that such notice by publication be given, not later than August 10, 1981, on three consecutive weekdays in two daily newspapers of general circulation in the Chicago metropolitan area. Such published notice was to include one advertisement in the general news section of each of the newspapers on the first day, occupying ⅛ of a tabloid or ¹⁄₁₆ of a broadsheet page, directing readers to the legal notice appearing the same day in the legal notice section of the newspaper.

55. The Court ordered that the mail and published notices should advise that "[a]ny person who believes that he or she is a member of any of the plaintiff classes, and any organization which believes itself to be a member of any of the plaintiff classes, may appear at the hearing in person or through an attorney and present his, her or its views on the proposed settlement," if they complied with certain minimal procedural requirements.

56. The steps prescribed in the Court's July 6, 1981 order concerning notice to members of the plaintiff classes were complied with (Affidavit of Richard M. Gutman dated August 28, 1981, filed August 31, 1981; Affidavit of Matthew J. Piers dated October 7, 1981, filed October 9, 1981). In addition to the first class mail and published notice required by the Court, the proposed settlements with City of Chicago and the Department of Defense received extensive coverage in the news media (Gutman Affidavit at pp. 2–3 and attachments thereto; Piers Affidavit at pp. 2–3 and attachments thereto).

57. The direct mail and published notices to members of the plaintiff classes,

both individuals and organizations, are likely to have reached, as far as practicable, the members of the plaintiff classes. The ordered notices constituted the best notice that was reasonably practicable under the circumstances of these cases.

58. As of the date of these findings, no members of the plaintiff classes have notified the Court that notice of the proposed City of Chicago and Department of Defense Settlements was received too late to permit that class member to present his, her or its views on the proposed settlements to the Court.

### N. *The Fairness Hearing*

59. On October 9, 1981, and continuing on October 16, 1981, the Court conducted a hearing on whether the proposed City of Chicago and Department of Defense Settlements are fair, reasonable and adequate, and should be approved by the Court. More than 100 persons attended during the two days of hearing.

60. In addition to attorneys for proponents of the City of Chicago and Department of Defense Settlements, 38 individuals who were putative class members, or representatives of organizations which were putative class members, filed notices of intention to appear and address the Court concerning one or both of the proposed settlements.

61. The Court received 17 written statements of views by persons and organizations who did not appear at the hearing, most expressing support for the proposed City of Chicago Settlement, and written notices by 16 additional persons stating their intention to appear at the fairness hearing, but who did not in fact appear. Also, the five non-participating *Alliance* plaintiffs and others prepared a form objection presenting a choice of objections to the City of Chicago Settlement: "for the reasons stated by [the non-participating *Alliance* plaintiffs]," or "because I/we feel that any negotiated settlement with these agencies without public trial in which they are held accountable for their crimes is an unjust compromise of this lawsuit." The non-participating *Alliance* plaintiffs distributed

these forms, and 20 persons or organizations filed them, checking one or more of the multiple-choice reasons. In addition, one of these purported class members filed a form, writing in her objection that "a promise by these agencies ... is not a sufficient guarantee that they will not engage in such illegal activity in the future." Written objections to the Department of Defense Settlement were filed by the same five non-participating *Alliance* plaintiffs, by one individual plaintiff class member, and by one organizational plaintiff class member.

62. At the hearing held on October 9 and October 16, 1981, the Court heard presentations concerning the City of Chicago and Department of Defense Settlements by attorneys for the proponents who spoke in support of the proposed settlements. In addition, the Court heard oral presentations by five representatives of the *Alliance* and *ACLU* named plaintiffs speaking in favor of the proposed City of Chicago Settlement, and from 22 persons who were not named plaintiffs, some of whom were counsel for others, and more than half of whom supported the proposed City of Chicago Settlement. Of the 26 putative class members who appeared to make oral presentations on October 9 and 16, 1981 (out of 38 who had originally filed notices of intention to appear), only six spoke in opposition to the Department of Defense Settlement. All persons and organizations that had filed requests to speak prior to that hearing, whether or not they had done so in a timely manner or otherwise satisfied the minimal procedural requirements specified in the notice to class members, and who were present on either day of the hearing, were provided an opportunity to address the Court with respect to the proposed settlements. All class members who requested to be heard concerning the proposed Settlements were given a reasonable and fair opportunity to present their views to the Court.

63. At the conclusion of the hearing on October 16, 1981, the Court took under advisement the fairness, reasonableness and adequacy of the proposed settlements, and

directed attorneys of record for the settling parties in these actions to submit proposed findings of fact and conclusions of law.

## II. *Conclusions of Law*

1. This Court has jurisdiction of the subject matter of these cases, and of all parties. 28 U.S.C. §§ 1331 and 1343; 18 U.S.C. § 2520; 5 U.S.C. § 552a.

■ 2. Rule 23(e) of the Federal Rules of Civil Procedure provides:

"(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

Rule 23(e) notice must sufficiently convey the required information and afford reasonable time for interested persons to make their appearance with due regard for the practicalities and peculiarities of the case. *Air Line Stewards, et al. v. American Airlines, Inc.,* 455 F.2d 101, 108 (7th Cir.1972).

■ 3. Having reviewed the affidavits of plaintiffs' counsel regarding the manner and extent of notice, and taking into account the further information presented at the fairness hearing, the Court finds that notice was provided in a fair and adequate manner. Notice was consistent with the Court's orders of June 15 and July 6, 1981 directing notice, with Rule 23(e), and with due process. Notice was also timely, having been given two months prior to the fairness hearing. In contrast, notice in *Armstrong v. Board of School Directors of the City of Milwaukee,* 616 F.2d 305 (7th Cir.1980), a leading case in this Circuit on settlements of civil rights class actions, was mailed only 12 days before the fairness hearing. 616 F.2d at 310; 471 F.Supp. at 805. *See also, Airline Stewards, supra,* 455 F.2d at 108 (three weeks' notice held timely).

■ 4. There is an "overriding public interest in favor of settlement," especially in class actions. *Armstrong, supra,* 616 F.2d at 312–13. By definition, a fair settlement need not satisfy every concern of the plaintiff class, but may fall anywhere within a broad range of upper and lower limits. "The essence of settlement is compromise . . . a solution somewhere between the two extremes." *Id.* at 315.

■ 5. The Court has a limited role in reviewing the settlement.

Because settlement of a class action, like settlement of any litigation, is basically a bargained exchange between the litigants, the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public. Judges should not substitute their own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *Id.*

Moreover, the Court cannot "modify the terms of a settlement proposal; it can only accept or reject the proposal as presented to it." *Armstrong v. Board of School Directors,* 471 F.Supp. 800, 804 (E.D.Wis.1979). This principle is especially important where, as here, virtually every line and paragraph of the settlement documents, and in many instances individual words, are the end products of intense, adversary, and prolonged negotiations.

■ 6. Because a class action settlement affects the rights of absent class members, and often, as here, the larger public interest, the Court may not uncritically accept it. *Armstrong,* 616 F.2d at 313. The settlement may be approved only if the Court finds it to be "fair, reasonable and adequate." *Id.* The burden of persuasion on the issue of fairness, reasonableness and adequacy is on the proponents of the settlement. The Court must "clearly set forth in the record its reasons for approving the settlement," stating its reasoning "with particular clarity." *Armstrong,* 616 F.2d at 315, 319.

■ 7. Although the decision whether to approve the settlement is within the discretion of the District Court, and the decision is necessarily made on a case-by-case basis, certain factors have been consistently identified as relevant to the fairness determination. Among them are:

(a) The strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.

(b) The defendant's ability to pay.

(c) The complexity, length and expense of further litigation.

(d) The amount of opposition to the settlement.

(e) Presence of collusion in reaching a settlement.

(f) The reaction of members of the class to the settlement.

(g) The opinion of competent counsel.

(h) The stage of the proceedings and the amount of discovery completed.

(i) Whether the settlement initiates or authorizes an illegal conduct. *Id.*

Each of these factors will be discussed.

*Factor 1: Strength of Plaintiffs' Case vs. Amount Offered in Settlement*

8. The first factor, which is generally regarded as the most important, is the strength of the plaintiffs' case balanced against what is offered in settlement by the defendants. While it requires some consideration of the merits, the Court must refrain from reaching conclusions on issues which have not been fully litigated.

9. The gravamen of plaintiffs' complaints against the settling defendants is a constitutional challenge to an alleged classwide course and pattern of conduct consisting of three basic types of alleged domestic intelligence practices: (a) investigations of persons and groups based on their lawful exercise of First Amendment rights, (b) disruption and harassment of persons and groups engaged in the lawful exercise of First Amendment rights, and (c) the use against such persons and groups of investigative means which are overly intrusive, in violation of First and Fourth Amendment rights, or which are otherwise illegal.

10. The relief sought on behalf of the plaintiff classes is essentially twofold: a declaration that such investigations, disruption, and investigative means are unconstitutional, and an injunction prohibiting their continuation.

11. The City of Chicago Settlement provides the plaintiffs with the injunctive relief they sought in this litigation. Its contents include the following key points:

(a) The settlement is in the form of a permanent injunction, enforceable by the Court, entitled "Agreed Order, Judgment and Decree", and is attached hereto as Appendix I.

(b) The key definitions that establish the scope of the injunction are broad. For example, in the City of Chicago Settlement, Appendix I to this Memorandum Opinion and Order, the definition of First Amendment conduct (Section 1.5), which is the core concept of the injunction, includes not only political and religious speech and assembly, but is stated broadly to include "the right to hold ideas or beliefs concerning public or social policy, or political, educational, cultural, economic, philosophical or religious matters," the right to assemble privately concerning such ideas or beliefs, the right to advocate alternative systems of government, and the right to associate in connection with legal advice and litigation.

12. The City of Chicago Settlement includes a set of prohibitions against improper activities which apply to any agent or agency of the City of Chicago. They include the proscription of any investigation undertaken because of a person's First Amendment conduct; of any disruption of or interference with a person because of such conduct; and of any collection of First Amendment information by illegal methods.

13. Extensive regulatory provisions were written into the injunction, concerning areas of police activity that are proper but have the potential to interfere with First Amendment activities. While there are many such provisions in Part 3 of the injunction, the highlights of this section are as follows:

(a) Investigative activity directed toward First Amendment conduct is entirely prohibited except in four specific types of investigations: criminal, dignatory protection, public gathering, and regulatory investigations (Section 3).

(b) For each type of investigation, a commencement standard is articulated. Most important of these is the requirement that a criminal investigation directed toward First Amendment conduct cannot be commenced unless there is "reasonable suspicion based on specific and articulable facts that the subject has committed, is committing, or is about to commit a crime." The reasonable suspicion standard is taken from the Supreme Court's decision in *Terry v. Ohio,* 392 U.S. 1 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968), which is a Fourth Amendment decision establishing the factual prerequisite for a stop-and-frisk. By this injunction, that standard is borrowed from the Fourth Amendment and incorporated as a protection against *investigation* of First Amendment conduct. Similar commencement standards are stated for the other types of investigations.

(c) Any investigation directed toward First Amendment conduct requires a written executive authorization specifically stating the grounds for the investigation (Section 3.1.4).

(d) Another basic requirement applicable to all investigations directed toward First Amendment conduct is that First Amendment information must be entirely left out of the investigative process, "unless it is so necessary to and inseparable from the purpose of the investigation that its gathering and retention cannot be avoided" (Section 3.1.1).

(e) Where investigative activity cannot entirely avoid First Amendment conduct, the impact upon First Amendment conduct must be consciously minimized (Section 3.1.2). This means, for example, that the least intrusive methods of investigative activity must be used in connection with First Amendment conduct.

(f) All investigations directed toward First Amendment conduct have a limited time period, and must be terminated when that time period expires or when the initial reason for the investigation no longer exists. If the investigation is to be continued beyond its original term, a new written authorization must be obtained (Section 3.1.5).

(g) There are strict limitations on dissemination by the police of First Amendment information (Section 3.1.6). In substance, such information may be disseminated only to a person conducting a criminal investigation based on reasonable suspicion of crime, or for a court proceeding.

(h) The injunction also contains limitations on the use of intrusive methods (Section 3.6). To note only some of the most important provisions in this part of the injunction, the use of any intrusive method must be specifically authorized by a police executive in writing; a judicial warrant must be obtained for any nonconsensual seizure of First Amendment information; and any infiltration must be personally approved in writing by the Superintendent of Police and no references except incidental references to any First Amendment information may be gathered by an infiltration (Section 3.6.3.-3).

14. All of city government is subject to the same restrictions as Part 3 of the City of Chicago Settlement imposes upon the Police Department.

15. In addition to provisions for internal implementation and monitoring of the City of Chicago Settlement by city government, there is also a provision for an independent audit by a national independent public accounting firm. Such audits are to be conducted in 1982, 1984 and thereafter at intervals of not more than five years, with the audit report to be made public. The auditors are to have access to all relevant data in the possession of the City of Chicago. In addition, there is provision that any violation of the judgment is to be discussed in the audit reports. Any substantial violation of the injunction must be investigated by the City of Chicago, with a report concerning the investigation to be presented to the Police Board.

16. More important than any internal enforcement mechanism, of course, is the character of the settlement as an injunction

enforceable by the Court. Jurisdiction is explicitly retained by the Court (part II) for enforcement of compliance with the injunction. The enforcement provision is taken verbatim from the Consent Decree in *Shakman v. Democratic Organization of Cook County, et al.,* entered May 15, 1972 and reprinted at 481 F.Supp. 1356 (N.D.Ill.). Application to enforce the Settlement may be presented "by any person affected by the conduct complained of.".

17. No judicial decision or legislative enactment regarding intelligence activities by any governmental entity has been cited to the Court, and the Court is aware of none, which is as protective of citizens' First Amendment rights as is the proposed City of Chicago Settlement.

18. The legal protections conferred upon the plaintiff classes by the proposed City of Chicago Settlement not only correspond well with the relief sought in the complaints, they also go far beyond the legal relief plaintiffs would likely have obtained if the cases had gone to trial. Counsel for the plaintiffs and counsel for the City of Chicago defendants all recognized that the Court would not likely have entered such a detailed and restrictive injunction following trial, assuming plaintiffs prevailed. Indeed, the Court is aware of no permanent judicial declaration or injunction ever entered against City of Chicago intelligence activities, even on behalf of a single litigant, much less in a class action.

19. The law with respect to government spying and intelligence activities is largely unsettled. *See generally, Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Indeed, as recently as December 1980, the City of Chicago asserted before this Court the legal position that the Constitution and the case law do not prohibit governmental surveillance of any First Amendment activity as distinguished from preventing or interfering with such activity.

20. Absent the proposed settlement, plaintiffs' proof of their case at trial would have encountered a number of difficulties, some of which, in other litigation involving similar issues, have seriously hampered or proved fatal to proof of the plaintiffs' case. These include the risk that the claim for declaratory and injunctive relief would have been denied as moot.

21. Also, there was the risk that even if the plaintiffs prevailed on the merits, and their claims for injunctive relief were held not moot, the Court might nonetheless decline to issue an injunction, or might issue an injunction less protective of their rights than the provisions of the proposed settlement. The City of Chicago defendants have made plain their intention to contend at trial that the Chicago Police Department should not be run by injunction. *See, Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

22. In sum, with respect to the first factor as it applies to the City of Chicago Settlement, the amount offered in the City of Chicago Settlement is fair, reasonable and adequate when balanced against the strength of plaintiffs' case on the merits against the City of Chicago defendants.

23. The Department of Defense Settlement agreement provides the plaintiffs with a portion of relief they sought in this litigation. (Paragraph references that follow are to the Department of Defense Settlement, Appendix II to this Memorandum Opinion and Order.) Paragraph 3.3 of the Department of Defense Settlement incorporates provisions of certain statutes, executive orders and internal Department of Defense regulations. Although some of these provisions may be modified by future legislative action or Presidential Executive Orders, and others may be modified by written Department of Defense regulations, guidelines and procedures, the settlement incorporates "the principle that no information shall be acquired about a person or organization solely because of that person's or organization's lawful exercise of First Amendment rights" (¶ 3.4(c)).

24. This principle is made permanent and legally enforceable by the Department of Defense Settlement. Under the provisions of paragraph 3.4(c), future Department of Defense regulations, guidelines,

procedures and conduct relating to the use of investigative techniques described in paragraph 3.3 must comply with this principle. Under paragraphs 5.1 and 5.2, "any of the terms" of the settlement, including this principle, may be enforced by a petition in this Court "for an appropriate order to enforce the Stipulation."

25. In short, the principle of paragraph 3.4(c), together with the enforcement provisions of paragraphs 5.1 and 5.2 of the Department of Defense Settlement, addresses one of the purposes of these class actions against the Department of Defense defendants, in that it articulates a legally enforceable prohibition on Department of Defense utilization of investigative techniques directed solely against lawful First Amendment activities.

26. Although less fundamental than this principle, the Department of Defense settlement places the following additional limitations on Department of Defense utilization of investigative techniques directed against United States persons not employed by the Department of Defense:

(a) Electronic surveillance in the City of Chicago must comply with the Constitution and applicable federal statutes. (¶ 3.3(a); 18 U.S.C. §§ 2510–20; 50 U.S.C. §§ 1801–1811). These statutes, of course, can be amended only by legislative action.

(b) Unlawful unconsented physical searches, unlawful entries, and unlawful disruption or harassment of lawful activities of United States persons for intelligence purposes in Chicago are prohibited (¶ 3.3(b)). This prohibition cannot be lifted by the Department of Defense (¶ 3.4(c)). It can be lifted only by a statute or by a Presidential Executive Order "specifically authorizing or directing the Secretary of Defense, the Secretary of a military service, or their subordinates to utilize any investigative techniques described in Paragraph 3.3" (¶ 3.4(a) and (b)).

(c) The provisions of statutes, Presidential Executive Orders and Department of Defense and military service regulations apply to the following types of intelligence conduct in the City of Chicago by Department of Defense agents: physical or photographic surveillance of United States persons not employed by the Department of Defense; covert participation in any organization; acquisition, dissemination or storage of information about United States persons not employed by the Department of Defense; and the provision of services, equipment, personnel or facilities to the Chicago Police Department, except for emergency assistance as part of disaster relief (¶ 3.3(c)).

27. The legal protections conferred upon the plaintiff classes by the Department of Defense Settlement compare well with the legal relief plaintiffs would likely have obtained if the cases had gone to trial. Counsel for the plaintiffs candidly stated that by the Department of Defense Settlement they did not obtain all that they desired to obtain. Counsel for the plaintiffs and counsel for the Department of Defense defendants all recognized that the plaintiffs' cases against the Department of Defense defendants contained evidentiary and legal weaknesses. Those infirmities have been considered by the Court in determining the fairness, reasonableness, and adequacy of the Department of Defense Settlement. After evaluating the strengths and weaknesses of the plaintiffs' case, and what the plaintiffs did receive and did not receive in the settlement agreement, the Court concludes that what was obtained in the Department of Defense Settlement agreement fairly reflects the potential strengths and weaknesses of the plaintiffs' case on the merits against the Department of Defense defendants.

28. Absent the proposed Department of Defense Settlement, plaintiffs' proof of their case against the Department of Defense defendants at trial would have been difficult, as plaintiffs' counsel candidly concede. There was a risk that important evidence would have been impossible to find because of internal Defense Department purges of domestic intelligence information

from its files, or because of evidentiary privileges such as the "state secrets" privilege, which Department of Defense defendants have already successfully asserted in this litigation. *American Civil Liberties Union v. Brown,* 609 F.2d 277 (7th Cir.1979), *after rehrng. en banc,* 619 F.2d 1170 (1980).

29. Also, there was the risk that the claims for declaratory and injunctive relief against the Department of Defense defendants would have been denied as moot. *See Halkin v. Helms,* No. 75–1773 (D.D.C. 1980), affirmed, *Halkin v. Helms,* 690 F.2d 977 (D.C.Cir.1982). The Department of Defense defendants have already made plain their intention to assert this defense, and there is at least some evidence to support it (¶¶ 2.1 and 2.2). It is noteworthy that despite extensive pretrial discovery, plaintiffs did not receive any Department of Defense domestic intelligence files or records which originated after 1971, several years prior to the filing of plaintiffs' claims against the Department of Defense defendants.

30. In sum, with respect to the first factor as applied to the Department of Defense Settlement, the amount offered in the Department of Defense Settlement is fair, reasonable and adequate when balanced against the strength of plaintiffs' case on the merits against the Department of Defense defendants.

### Factor 2: Defendants' Ability to Pay

31. Since the claims of plaintiff classes are only for declaratory and injunctive relief, this factor is not relevant here. *Cf. Armstrong, supra,* 471 F.Supp. at 805.

### Factor 3: Complexity, Length and Expense of Further Litigation

32. The Court has already found that it is very likely that further litigation, absent the proposed settlements, would be extremely complex, lengthy and expensive. The reasons for this conclusion—the factual breadth of these cases, the number and difficulty of legal issues they pose, and the sharply adversary relation of the parties and history of the litigation—need no further elaboration.

### Factor 4: Amount of Opposition to the Settlement

33. The Court may approve a fair settlement over objections by some or many class members, and even despite criticism by some named plaintiffs. *Armstrong,* 471 F.Supp. at 804; 616 F.2d at 326.

34. The number of objectors here is not large under any standard, but particularly given the many thousands of plaintiff class members who received notice, the unsettled nature of some of the relevant law, and the depth of antagonism between many of the plaintiff class members and the settling defendants. Indeed, the amount of opposition by class members here is much less than that in *Armstrong,* where 45 persons testified at the fairness hearing and numerous others sent in written statements, "most to express their dissatisfaction with the settlement," which was nonetheless approved as fair. 616 F.2d at 326; 471 F.Supp. at 805.

35. Moreover, most of the objections here, as in *Armstrong,* although "thoughtful and informative," are also "somewhat misinformed," both in their understanding of the proposed settlements and as to the state of the relevant law. 616 F.2d at 326, quoting 417 F.Supp. at 812. Based upon the written comments received by the Court and upon hearing the presentations of the attorneys and individuals who spoke at the hearing, it was readily apparent to the Court that many of those individuals who spoke were not familiar with the details of the proposed settlements. Some comments appeared to be based more on opposition to *any* agreement with the government, than on a specific assessment of these proposed settlements. Also, while certain of the objectors were clearly well informed and forceful in their objections, they were persons, or counsel for persons, who were litigating in other unresolved cases concerning either similar issues, the same defendants, or both.

### Factor 5: Presence of Collusion in Reaching a Settlement

36. No suggestion of collusion has been made, nor, on this record, would any such suggestion be credible.

*Factor 6: Reaction of Members of the Class to the Settlement*

37. The law in this Circuit as implied in *Armstrong* is that the Court must consider all objections, but need not state individualized findings with respect to each of them. 616 F.2d at 326, 471 F.Supp. at 812–13. However, the Court's reasoning must be stated "with particular clarity." 616 F.2d at 319. In light of this last admonition, and the case law elsewhere requiring a reasoned response on the record to all objections of substance and some explicit statement concerning all objections, *Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832, 836 (9th Cir.1976), the Court will discuss all objections of substance. Objections which were made to both the City of Chicago and Department of Defense Settlements are discussed first; then objections made to the City of Chicago Settlement only; and finally objections made to the Department of Defense Settlement only.

38. *Findings and Admissions.* Some objectors argue that both the City of Chicago and the Department of Defense Settlements make no findings and contain no admissions of wrongdoing by the City of Chicago, the Department of Defense, or their agents. But the essential purpose of a settlement is to avoid adjudication of the lawfulness or propriety of conduct which is the subject of allegations of the complaint. It would defeat an important purpose of settlement, and therefore render settlements less attractive to the parties, if the settlement agreement were required to include admissions of wrongdoing by the defendants, or if the Court itself made such findings in connection with a proposed settlement. Such a procedure would constitute an unwarranted interference by the Court in the efforts of the parties to resolve their differences short of adjudication of the allegations of the complaint.

39. *Alleged Continuing Abuses.* Allegations have been made that both the Chicago Police Department and the Department of Defense continue to engage in some of the practices alleged in the complaints. The Court, of course, expresses no opinion on the substance of these allegations. However, if true, such facts would argue for approving the settlements, not disapproving them. If such alleged practices continue after the settlements are approved, any person affected can present his or her claim to the Court for a ruling on whether the activities in question are improper under the Settlements. If they are, the complainant may obtain an appropriate order, including enforcement of the terms of the settlements.

40. *Vagueness.* It is objected that the provisions of the City of Chicago Settlement are so vague as to render it a sham. The Court does not agree. The City of Chicago Settlement is, in fact, remarkably detailed and specific. The ambiguities which do exist in the potential applications of these provisions arise from the fact that they are, for good reasons, worded in general terms. Plaintiffs' central claims are constitutional in nature. Like any legal restrictions grounded in constitutional values, it is appropriate that the remedial provisions of the settlement be generally framed to some extent. They are meant to govern a great variety of specific situations, many of which cannot now be foreseen, over an extended period of time. Moreover, the proposed City of Chicago Settlement resolves class actions, the comprehensive scope of which embraces a great variety of City of Chicago practices. Generally worded restrictions are probably indispensable to the settlement of such lawsuits. The alternative—attempting to agree in advance on a wide variety of specific questions in hypothetical settings—is neither practical nor necessarily wise.

41. The presentations of the parties at the fairness hearing demonstrate that they would not necessarily agree on all possible applications of the language of the provisions in the abstract or in hypothetical cases. However, both sides have agreed to submit to enforcement by the Court, if and when specific disagreements arise in concrete cases in the future. Having examined the language of the City of Chicago Settlement, as well as the various questions

raised and views expressed concerning the possible interpretations, the Court is confident that in the context of concrete cases, it will be able to perform the judicial function of reasonably interpreting the language to accomplish the purpose of the document as a whole. As the Court made clear at the October 16 hearing, the parties' various interpretations of the principles are not binding. All that is binding now is the language of the document; the only binding interpretations will be made later, by the Court, in the context of real disputes.

42. *Mislabeling of Political Investigations.* Some objectors argue that the Chicago police can evade the terms of the City of Chicago injunction by simply labeling a political intelligence investigation as a criminal, dignitary protection, public gathering or regulatory investigation. They are wrong. The injunction does not turn on labels. For example, in order to carry out a criminal, dignitary protection, or regulatory investigation that is directed to First Amendment conduct, the police must satisfy appropriate objective standards regarding the investigation's origins and purposes (see Sections 3.2.1, 3.2.2, 3.3.1, 3.5.1). In a case of disputed investigation, the Court, not the police, will determine whether the investigation complies with the injunction.

43. *Overbroad Criminal Investigations.* Some objectors maintain that the City of Chicago injunction permits unlimited spying and disruption against anyone who has ever engaged in civil disobedience or other unlawful political activity. The Court finds that the injunction does provide fair, reasonable, and appropriate protection to such individuals from overbroad criminal investigations. See Sections 3.1.1 and 3.1.2 of the injunction.

44. *Disruption.* Some objectors argue that the City of Chicago Settlement does not prohibit all unlawful disruption activities, such as the type alleged to have occurred in the FBI's COINTELPRO (Counterintelligence Program). The Court does not agree. Section 2.2 of the Settlement states that "No agency or agent of the City of Chicago shall disrupt, interfere with or harass any person because of the person's First Amendment conduct." Section 3.1.2.1 requires the City of Chicago "to take every reasonable precaution to avoid gathering information about, or interfering with, First Amendment conduct, and when it cannot be avoided to follow a conscious course of conduct that reduces, as much as possible, the impact on First Amendment conduct."

45. *Authorization of Illegal Activity.* Some objectors assert that the City of Chicago Settlement authorizes or legitimizes future police misconduct of the type alleged in these lawsuits. Such concerns are based on a misreading of the Settlement. The purpose and effect of the City of Chicago Settlement is to forbid political spying and harassment, not to support it. The Settlement does not declare the lawfulness of any investigative or intelligence procedure. Because something is not restricted or prevented by the injunction does not mean that it is lawful—only that it is not dealt with in this decree.

46. Furthermore, all persons affected retain their full rights to challenge any future misconduct by the City or its agents either under this agreed injunction or in a separate lawsuit or other appropriate proceeding.

47. *"United States Persons."* With respect to the Department of Defense Settlement, it is objected that certain provisions of that Settlement protect only "United States persons," defined to include United States citizens, aliens lawfully admitted for permanent residence, unincorporated associations organized in the United States or substantially composed of United States citizens or aliens lawfully admitted for permanent residence, and corporations incorporated in the United States (¶ 6.3). Objectors express concern that because of this definition, some portion of the plaintiff classes is left without protection.

48. As a practical matter, persons not lawfully or permanently admitted to residence in this country are covered by the settlements when their activities are through groups organized in this country,

since "United States persons" include all unincorporated associations "organized" in this country and all corporations incorporated here. To the extent individual aliens not lawfully or permanently admitted to residence, and not acting through groups, are not covered by the principles, this distinction reflects the greater uncertainty in the law with respect to the legal rights of such persons. *See generally Narenji v. Civiletti,* 617 F.2d 745 (D.C.Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980), and cases cited therein.[2]

49. Moreover, non-"United States persons," even when not acting through groups which are themselves "United States persons," are nonetheless protected by several provisions of the Department of Defense Settlement. Electronic surveillance of them must be "in accordance with the Constitution and applicable federal statutes, 18 U.S.C. §§ 2510–20 (1976) and 5 U.S.C. §§ 1801–1811 (Supp. II 1978)" (¶ 3.3(a)). They are protected by the ban on "unlawful uncontested physical searches" (¶ 3.3(b)); the ban on "any 'unlawful entries' that constitutes searches under the Fourth Amendment" (*Id.*); the requirement that Defense Department infiltration of organizations comply with applicable laws, regulations and guidelines (¶ 3.3(c)(2)); the ban on intelligence assistance by the Department of Defense to the Chicago Police Department (¶ 3.3(c)(4)); and the requirement that investigative techniques comply with the Constitution (¶ 3.4(c)). All of these requirements may be enforced by any non-United States person who is "a member of the plaintiff classes" (¶ 5.1).

50. *Disruption and Harassment.* Some objectors argue that the Department of Defense Settlement does not declare that Department of Defense disruption and "neutralization" activities are unconstitutional, and does not unequivocally ban such activi-

ties. In fact, however, the Settlement does provide that the Secretary of Defense and his agents "shall not conduct in the City of Chicago for intelligence purposes . . . any unlawful disruption or harassment of lawful activities of any United States person" (¶ 3.3(b)). Since the Secretary of Defense has refused, as is common in settlement agreements, to admit that he or his agents have engaged in any of the conduct alleged in the complaint (¶ 1.1), it would be wholly inappropriate for the Court to make findings or conclusions concerning the constitutionality of such alleged activity. Moreover, since the Department of Defense Settlement prohibits "any unlawful disruption or harassment of the lawful activities of any United States person," it is left for the Court to determine, in the context of a future enforcement action, what disruption or harassment is "unlawful."

51. *Future Modifications of the Joint Stipulation.* Some objectors argue that all of the protections of the Department of Defense Settlement may be superseded by unilateral Department of Defense action. This is incorrect. Statutory protections can be changed only by Congress and Executive Orders can be changed only by the President. Furthermore, any changes in departmental, service or agency regulation, guideline or other procedure, as permitted by paragraph 3.4(c) of the Department of Defense Settlement, must be in accordance with "the principle that no information shall be acquired about a person or organization solely because of that person's or organization's lawful exercise of First Amendment rights and shall not be contrary to any applicable federal statutes or the United States Constitution." (¶ 3.4(c)). Plaintiffs, of course, remain free to challenge any such future modifications on the grounds that they are not consistent with the Constitution, applicable federal stat-

---

**2.** The distinction in the national security intelligence field between "United States persons" and others was created by both Presidential and Congressional directives. Executive Order 12036, § 4–214 (governing national security intelligence activities) (from which the settlement's definition of "United States person" is

taken verbatim); 50 U.S.C. § 1801(i) (the less inclusive definition of "United States person" in the Foreign Intelligence Surveillance Act). Plaintiffs would therefore encounter legal difficulties in challenging the distinction. *See Matthews v. Diaz,* 426 U.S. 67, 78–85, 96 S.Ct. 1883, 1890–94, 48 L.Ed.2d 478 (1976).

utes, or the restriction of the Department of Defense Settlement just quoted. At the fairness hearing, plaintiffs' attorneys expressed their willingness to mount such challenges in appropriate cases. They also conceded to the Court that while the modification provisions of the Department of Defense Settlement were not as favorable to plaintiffs as those in the settlements with the FBI and the CIA, this difference was accounted for by plaintiffs' weaker case against the Department of Defense defendants.

■ 52. *Enforcement.* The enforcement standards and procedures (¶ ¶ 5.1, 5.2) are said to place an unreasonable burden on members of the plaintiff class. In fact, under the Department of Defense Settlement enforcement is triggered by a threshold finding of "reasonable grounds to believe that a violation of the terms of the Stipulation has occurred or is occurring" (¶ 5.1). The purpose of this "reasonable grounds" standard is to prevent frivolous or harassing enforcement petitions; both the purpose and the language chosen to accomplish it are fair, adequate and reasonable. If, after hearing, the Court finds "a pattern of substantial non-compliance or a serious intentional non-compliance" it may make "such order as it deems just and necessary to ensure future compliance with the Joint Stipulation" (¶ 5.2). This language, too, reflects a fair, adequate and reasonable compromise, which permits civil enforcement of the Department of Defense Settlement without subjecting the Department of Defense to court orders based on minor or technical violations.

53. *Geographic Scope.* The objectors criticize the Department of Defense Settlement because its geographic scope is restricted to the corporate limits of the City of Chicago. However, the definition of the plaintiff classes was limited to persons located at various times in the City of Chicago. Therefore, it was not unreasonable for the Department of Defense to decline to agree to a settlement which imposed restrictions on Defense Department conduct beyond the geographic scope covered by the allegations of the complaint and the class definition approved by this Court.

54. *Inadequate Restrictions.* One objector objected that the Department of Defense Settlement does not impose a total ban on Department of Defense domestic intelligence activities, similar to the Central Intelligence Agency settlement approved earlier by this Court. Any greater restriction on domestic intelligence activities by the Central Intelligence Agency is merely a reflection of the fact that while the National Security Act of 1947, 50 U.S.C. § 403, specifically bars the Central Intelligence Agency from exercising any law enforcement or internal security functions, no comparable statutory ban exists in the case of the Department of Defense.

55. *Superseding Regulations Unavailable.* One opponent of the Department of Defense Settlement objected at the fairness hearing that some of the Department of Defense directives which, under paragraph 3.4 of the Settlement, might supersede restrictions on Department of Defense domestic intelligence activities might be classified, and that persons seeking to enforce the Department of Defense Settlement would thus never learn of the existence of such directives. This argument apparently refers to paragraph 3.5 of the Settlement which entitles any class member upon request to be provided a copy "of the unclassified portions of any then existing procedures" which would modify the protections in paragraph 3.3. This objection is not a grounds for disapproval of the Department of Defense Settlement for two reasons. First, the prohibitions on Department of Defense domestic intelligence activities contained in paragraph 3.3 of the Settlement are public, and would be enforced by the Court unless and until the Court became convinced that those provisions had been modified by some written Department of Defense directive or other authority described in paragraph 3.4 of that Settlement. Thus, the burden would be on the Department of Defense to justify to the Court, as authorized by written Defense Department directive of the type described in paragraph

3.4, any course of conduct in conflict with the prohibitions in paragraph 3.3. Second, even if classified documents allegedly modifying terms of the Department of Defense Settlement are not produced pursuant to a paragraph 3.5 request, they can be reviewed by the Court *in camera* to determine if they do, in fact, supersede the Settlement as claimed.

■ 56. *Court Supervision Intermittent.* It was objected at the fairness hearing that judicial supervision of Department of Defense domestic intelligence activities in Chicago would be only "intermittent and cursory." This Court is not a super-Defense Department, and the Department of Defense Settlement is not intended to make it so. The Court's function under the Settlement is limited to adjudicating charges of violations of the Settlement. The Court is not responsible for permanent and continuing supervision of all aspects of Defense Department intelligence activities in the City of Chicago. Such a responsibility would be an insupportable burden which this Court would not undertake, even if it could.

57. *Reports of Non-Compliance.* It was objected that internal Department of Defense reports on compliance with its own regulations restricting domestic intelligence activities by military authorities could be "censored" by Department of Defense officials. This was apparently a reference to reports described in paragraphs 5.3 and 5.4 of the Department of Defense Settlement made by the Inspector Generals and General Counsels of the Department of Defense and the military services to identify unlawful or improper domestic intelligence activities. Under the terms of the Settlement, the Department of Defense may exclude from such reports the identities of persons providing information under a promise of confidentiality and may summarize, rather than producing verbatim, portions of such reports which are classified. Such a summary must be accompanied by a declaration under penalty of perjury that the summary is as accurate and complete as it can be without disclosing the information which

the classification was intended to protect (¶ 5.4). These provisions are a reasonable compromise between the plaintiffs' interest in monitoring Department of Defense compliance with its own regulations, and the Department of Defense's interest in protecting the identity of legitimate intelligence sources and maintaining the security of intelligence methods. The Court finds these provisions to be fair, adequate and reasonable.

58. *No Sanctions for Prohibited Conduct.* Another objection was that the Department of Defense Settlement contains no sanctions against either the Department of Defense or its agents if they engage in conduct which is prohibited by the Settlement. The Settlement does provide in paragraph 5.2 that the Court may "make such order as it deems just and necessary to ensure future compliance with the Joint Stipulation," whenever it finds that a pattern of substantial non-compliance or a serious intentional non-compliance with the Joint Stipulation has occurred or is occurring (¶ 5.2). Since the Department of Defense Settlement is the product of a negotiated settlement of plaintiffs' claims, and not a criminal statute or an administrative regulation, the authorization to the Court to enter orders which are, of course, enforceable by the usual means is an appropriate sanction.

59. In summary, for the reasons discussed above, the Court concludes that none of the various objections raised to the City of Chicago and Department of Defense Settlements, either alone or taken together, raises any serious question as to the fairness, reasonableness and adequacy of those settlements.

*Factor 7: Opinion of Competent Counsel*

■ 60. The Court is "entitled to rely heavily on the opinion of competent counsel." *Armstrong,* 616 F.2d at 325. Counsel for the participating plaintiffs, for the City of Chicago, defendants, and for the Department of Defense defendants all spoke in favor of the proposed settlements. They stated that the suits were difficult and com-

plex, that the negotiating process had been difficult and at arms length, and that the proposed Settlements provided a fair, reasonable and adequate disposition of these actions. All of those counsel stated that the Settlements, like any settlement, involved concessions on both sides which made final agreement possible. The Court has found that counsel for the parties participating in the settlements are highly competent, and relies in part on their strong endorsement of the proposed settlements.

### Factor 8: Stage of Proceedings and Amount of Discovery Completed

61. The proposed City of Chicago Settlement was entered into when massive discovery was substantially complete. Plaintiffs' and defendants' draft final pretrial materials had been served, and both sides were fairly apprised of the facts likely to be adduced at trial, and fairly enabled to assess the likely outcome of trial. Plaintiffs' discovery against the Department of Defense defendants had progressed far enough to provide plaintiffs and their counsel with a reasonable idea of the type of evidence which might be available to them at a trial on the merits. In addition, plaintiffs had the benefit of other information concerning the nature and extent of Department of Defense domestic intelligence activities since 1971 to permit them to make a reasonable evaluation of the terms of the proposed Department of Defense Settlement.

### Factor 9: Whether the Settlement Initiates or Authorizes Illegal Conduct

62. A fair settlement may not initiate or authorize any illegal conduct. However, the Court must not decide unsettled legal questions. Any illegality or unconstitutionality must appear "as a legal certainty on the face of the agreement." Further, the conduct must be illegal "as a general rule," according to the state of the law at the time the settlement is presented to the District Court for approval. *Armstrong,* 616 F.2d at 319–322. No illegal or unconstitutional conduct is authorized by either of the proposed settlements.

*Conclusion*

63. Considering all of the foregoing findings and conclusions, and being otherwise fully advised in the premises, the Court concludes that the City of Chicago and the Department of Defense Settlements are fair, reasonable and adequate, and accordingly that they should be, and hereby are, approved by this Court.

64. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court hereby expressly finds that there is no just reason for delay and hereby directs the entry of final judgment upon all of the claims which are resolved by the proposed settlement agreements. Proponents of the City of Chicago and Department of Defense Settlements shall submit to the Court separate proposed forms of Judgment Order.

### AGREED ORDER, JUDGMENT AND DECREE

### PRELIMINARY STATEMENT OF PRINCIPLES

The named plaintiffs in these two actions (who are listed in Appendix A) having filed their complaints herein, and said plaintiffs (on behalf of themselves and the classes they represent herein as determined by previous Orders of Court and set out in Appendix B) and the City of Chicago defendants (named in Appendix C) having consented to the entry of this Agreed Order, Judgment and Decree as to such parties, without trial and without adjudication of any allegation in the complaints or any issue of fact with respect to the alleged commission by said defendants of any unconstitutional, unlawful or wrongful act, and without this Agreed Order, Judgment and Decree constituting evidence of or an admission by any defendant with respect to any issue of fact herein or the commission of any unconstitutional, unlawful or wrongful act;

This Court having jurisdiction of the parties to this Agreed Order, Judgment and Decree and of the subject matter of these actions under Sections 1331 and 1343(3) of Title 28 of the United States Code; and,

The parties to this Agreed Order, Judgment and Decree having agreed upon the following general principles which govern the constitutional protection of individual rights, the law enforcement duties of the City defendants, and City policy concerning First Amendment conduct:

A. *Purpose of the Statement of Principles.*
By this statement of principles, it is not the intent of the parties to make a complete statement of the applicable constitutional and state law as it has been interpreted by the courts; but it is the intent, by this joint statement, to manifest the strong agreement of the parties on principles which govern their conduct, in the expectation that as the general principles are accepted and understood, the day-to-day pattern of conduct will more readily conform to the principles.

B. *Constitutional Protection of Individual Rights.*
1. The First Amendment of the U.S. Constitution protects the rights of a person to freedom of speech, press, assembly, petition and religion, including without limitation the rights to hold, communicate and receive ideas and beliefs, to speak and dissent freely, to associate for the advancement of litigation, to write and publish, to advocate and organize concerning public policy and social issues and to associate publicly and privately with other persons concerning political and social issues.

2. The Fourth Amendment of the U.S. Constitution protects the rights of a person to be secure in person, house, papers and effects against unreasonable search and seizure, and the right to be secure in communications which are engaged in with reasonable expectation of privacy. This Amendment protects the innocent and the guilty alike against governmental intrusion not justified by an appropriate governmental interest or function.

3. The Fourteenth Amendment guarantees to a person equal treatment under the law unless an appropriate governmental interest or function justifies an exception.

C. *The Importance of Effective Law Enforcement.*
1. It is the duty of the Chicago Police Department to aggressively enforce the penal and regulatory laws of the State of Illinois and ordinances of the City of Chicago. The Department must apprehend persons who have violated the criminal law and must, by lawful means, anticipate and endeavor to prevent the commission of crime.

2. It is the duty of the Chicago Police Department to protect the physical safety of visiting public officials and other dignitaries.

3. It is the duty of the Chicago Police Department in connection with public gatherings to maintain the public peace by enforcing the regulatory statutes and ordinances of the State and City and to protect the exercise of Constitutional rights of all persons.

4. It is the duty of the City of Chicago and its Police Department to respect, to affirmatively protect and to minimize interference with the Constitutional rights of all persons.

D. *City Policies Concerning First Amendment Conduct.*
1. No investigation shall be conducted for political, religious or personal reasons. First Amendment information may be gathered only for valid governmental purposes in accordance with this Judgment.

2. No person shall be prejudiced in dealings with government because of, nor disrupted in the exercise of, the person's political beliefs, associations or other First Amendment conduct.

3. All employees and agents assigned to or engaged in investigative activity shall be trained and supervised to perform their duties in accordance with the law.

NOW, THEREFORE, upon consent of the parties and approval of the court, it is hereby ORDERED, ADJUDGED and DECREED:

## I. PERMANENT INJUNCTION

The City of Chicago, the City defendants, their officers, employees and agents, and all persons in active concert or participation with them who receive actual notice of this Judgment, are hereby permanently enjoined as follows:

### 1. SUMMARY OF THE SCOPE OF THIS JUDGMENT; BASIC DEFINITION.*

1.1 The principal provisions of this Judgment apply only to *investigative activity* (as defined in 1.2 below p. 10) that is *directed toward First Amendment conduct* (as defined in 1.3–1.5 below p.10).

1.1.1 This Judgment does not apply to *investigative activity* that is not directed toward *First Amendment conduct* or that merely includes *incidental references* to such conduct. It is the expectation of the parties, for example, that the great majority of police activity (e.g., investigation of property crimes, personal violence, narcotics and gambling, as well as routine patrol and on-view enforcement action) will not be affected by this Judgment.

1.1.2 This Judgment prohibits any investigation of *First Amendment conduct* in the absence of one of the valid governmental purposes specified herein (e.g., criminal investigation) and also prohibits investigation or disruption of a person because of the *person's First Amendment conduct.* It is the expectation of the parties, for example, that systematic investigation and record keeping about political and social action organizations unrelated to criminal conduct is prohibited by this Judgment.

1.1.3 This Judgment permits, but regulates, *investigative activity* that is *directed toward First Amendment conduct* in the course of performing a valid governmental function specified herein. The regulatory provisions of the Judgment are intended to permit functions

such as criminal investigations (including investigations of criminal activity in furtherance of political goals) to be conducted effectively while controlling and limiting their impact on *First Amendment conduct.* The regulatory provisions generally require that *investigative activity* that is *directed toward First Amendment conduct* have a valid purpose, a reasonable factual basis and supervisory authorization; that the impact on *First Amendment conduct* be minimized; and that the retention and dissemination of *First Amendment information* be strictly limited.

1.1.4 This Judgment acknowledges the propriety of criminal intelligence investigations as a law enforcement technique, including the collection, analysis and dissemination of information about systematic criminal conduct. This Judgment applies to such investigations only when they are *directed toward First Amendment conduct.*

1.1.5 This Judgment does not address or affect the use of covert police investigative techniques, such as *informants,* except when such techniques are *directed toward First Amendment conduct.*

1.2 *Investigative activity* means the collection of information by any means, including its acquisition from another agency or from another unit within the same agency, or the recording, filing, retention, indexing or dissemination of information.

1.3 *Investigative activity* is *directed toward First Amendment conduct* when it does or foreseeably will (other than by *incidental reference* ):

1.3.1 include the collection or handling of information about *First Amendment conduct;*

1.3.2 have as a subject or target a *person* who is actively and substantially engaged in *First Amendment conduct,* where the *investigative activity* relates to that conduct; or

* The summary in Part 1 is for the purpose of facilitating understanding of the detailed provisions of the Judgment; the latter are controlling in the event of uncertainty of interpretation or scope of the Judgment. Terms underscored are defined in Part 1 or at appropriate points in the text. An index of definitions appears in Part 6, p. 34.

1.3.3 interfere with *First Amendment conduct.*

1.4 *Investigative activity* is not directed toward *First Amendment conduct* merely because it includes relevant *incidental references* to *First Amendment conduct.* An *incidental reference* is an occasional or isolated reference to *First Amendment conduct* where:

1.4.1 the conduct is not itself a significant issue in or focus of an investigation; and

1.4.2 the reference is relevant to the law enforcement purpose of the *investigative activity.*

Examples of *incidental references* include information that a community organization was a burglary victim, information that a *person* reasonably suspected of narcotics crimes might be found at a certain church or political organization, or a name and address index maintained by a police or other city official of persons dealt with in the course of overt community relations activity or a file of correspondence with such persons concerning such activity.

1.5 *First Amendment conduct* means conduct protected by the rights under the First Amendment of the Constitution of the United States to freedom of speech, press, assembly, petition and religion, including but not limited to the following rights:

1.5.1 the right to hold ideas or beliefs concerning public or social policy, or political, educational, cultural, economic, philosophical or religious matters;

1.5.2 the right to communicate or receive such ideas or beliefs, publicly or privately, orally, in writing or by symbolic means;

1.5.3 the right to associate and assemble publicly or privately with other persons concerning ideas or beliefs about public or social policy, or political, educational, cultural, economic, philosophical or religious matters (but not a right to associate or assemble for purposes unrelated to the right to hold and express such ideas or beliefs);

1.5.4 the right to advocate, for purposes related to such ideas or beliefs, "the use of force or of law violation, except where such advocacy is directed to inciting or producing imminent lawless conduct and is likely to incite or produce such action," *Brandenburg v. Ohio,* 395 U.S. 444 (1969); with respect to the above, it is the duty of the Chicago Police Department, when it learns of an instance of such advocacy of the use of force or of law violation, to make prudent and reasonable inquiry to determine whether it is an exercise of the expression of ideas only or whether it is directed to inciting or producing imminent lawless conduct and likely to incite or produce such action; this inquiry shall be conducted in accordance with § 3.2.5;

1.5.5 the right to advocate alternative systems of government;

1.5.6 the right to petition the government or governmental officials for redress of grievances; and,

1.5.7 the right to associate for the purpose of seeking and giving legal advice as well as advancing litigation.

1.6 *First Amendment information* means information about a *person's First Amendment conduct.*

## 2. PROHIBITIONS THAT APPLY TO ALL AGENCIES OF THE CITY OF CHICAGO.

No agency or *agent* of the City of Chicago shall:

2.1 investigate or prosecute a *person,* solely because of the person's *First Amendment conduct,* or selectively for political, religious, or personal reasons (except as permitted by law in the discipline of public employees);

2.2 disrupt, interfere with or harass any *person* because of the person's *First Amendment conduct;*

2.3 gather any *First Amendment information* by *intrusive methods* except pursuant to Part 3.6 of this Order (p. 27), or by illegal methods, or receive or maintain information so gathered by others;

2.4 authorize, assist or encourage any person to violate this Order, or to commit an act that would violate this Order if committed by a City *agent;* or,

2.5 conduct any investigation, or maintain any file or file system, *directed toward First Amendment conduct* that the Police Department may not conduct or maintain under the provisions of Part 3 of this Judgment.

## 3. POLICE DEPARTMENT INVESTIGATIONS.

Police Department employees and *agents* may engage in *investigative activity directed toward First Amendment conduct* ONLY in a criminal, dignitary protection, public gathering or regulatory investigation that is conducted in compliance with Part 3 of this Judgment.

3.1 *Basic Procedures for Investigations.* In every criminal, dignitary protection, public gathering or regulatory investigation that is directed toward *First Amendment conduct:*

3.1.1 *First Amendment information* shall not be gathered nor become part of any investigative file unless it is so necessary to and inseparable from the purpose of the investigation that its gathering and retention cannot be avoided. *First Amendment information* shall not be gathered which violates the confidentiality of attorney-client communications.

3.1.2 *Minimization* procedures shall be employed with respect to *First Amendment conduct.* Minimization means:

3.1.2.1 to take every reasonable precaution to avoid gathering information about, or interfering with, *First Amendment conduct,* and when it cannot be avoided to follow a conscious course of conduct that reduces, as much as possible, the impact on *First Amendment conduct.*

3.1.2.2 to use the least *intrusive methods* of effectively conducting *investigative activity* about *First Amendment conduct.*

3.1.2.3 For example, unless unavoidably necessary to the investigation of a reasonably suspected crime, no information shall be gathered about a political group to which a criminal suspect belongs or about other members of the group or about other *persons* attending political meetings where the suspect is present, including their identities, statements and photographs.

3.1.3 *Intrusive Methods.* No *First Amendment information* shall be gathered by *intrusive methods,* except in compliance with Part 3.6 (p. 27) of this Judgment.

3.1.4 *Authorization.* The investigation shall not be initiated unless authorized in writing by the Superintendent of Police, or by a member of his *executive* staff [i.e., Deputy Superintendents or Executive Assistants to the Superintendent] designated by him, in the following manner:

3.1.4.1 The written authorization shall specify in detail the factual basis for the investigation; the apparent criminal offense or other specific reason for the investigation; the *person*(s) to be investigated, if known; the investigative methods to be used; *minimization* measures to be employed; and the duration of investigation ([not to exceed 30 days]).

3.1.4.2 The investigation shall not be continued unless the *executive* reviews and reauthorizes it in the same manner at intervals of not more than [30 days].

3.1.5 Termination. *The investigation shall be terminated when its written authorization expires or earlier when:*

3.1.5.1 the standard under which it was initiated (e.g., *reasonable suspicion* of crime) is no longer met; or

3.1.5.2 its purpose has been achieved or the event to which it related (e.g., a *public gathering*) has taken place.

3.1.6 *Security* of all *First Amendment information* shall be strictly maintained. *Security* of information means that the unit collecting the information makes or permits no dissemination of the information whatsoever except:

3.1.6.1 to a Chicago police officer conducting a criminal investigation in compliance with this Judgment;

3.1.6.2 to a state or federal prosecutor who requests the information for a criminal prosecution;

3.1.6.3 in response to a subpoena;

3.1.6.4 to another governmental law enforcement agency upon its signed written request certifying that the information is needed in a criminal investigation based upon *reasonable suspicion* of crime, and only if such agency agrees to make no further dissemination of the information except in a criminal prosecution and to destroy or return it when no longer needed; or

3.1.6.5 to the subject of the information when required by legislation or when permitted by departmental policy.

For each dissemination, complete documentation shall be maintained, including the recipient, date, reason, and a copy of the information disseminated.

3.1.7 *Purging.* Upon completion or termination of an investigation, all information gathered shall be reviewed, and any *First Amendment information* (other than *incidental references*) shall be *purged* unless there exists *reasonable suspicion* of criminal activity and some nexus is established showing that the criminal activity is being sheltered under the guise of exercising First Amendment rights.

3.1.7.1 *Purging* of information means to remove it from all files or documents and place it in a sealed file. No one shall have access to such sealed files except for the purposes of auditing and enforcing compliance with this Judgment; such access shall be limited to persons specifically authorized by the Superintendent of Police, designated representatives of the Chicago Police Board, and persons acting under judicial authority.

3.1.7.2 On an [annual] basis, information in sealed files shall be transferred to a sealed retention file under the personal control of an *executive* designated by the Superintendent and there retained for [ten years] and then destroyed. The destruction may be delayed if the information is relevant to pending litigation. If the information is relevant to anticipated litigation either party may apply to the Court for appropriate relief.

3.2 *Criminal Investigations Directed Toward First Amendment Conduct.* Any criminal investigation that is *directed toward First Amendment conduct* must comply with Part 3.1 and also with the following:

3.2.1 It shall be conducted solely for the purpose of obtaining evidence of criminal conduct that has occurred, is occurring or is about to occur.

3.2.2 It shall not be conducted unless there is *reasonable suspicion*[1] based on specific and articulable facts that the subject has committed, is committing, or is about to commit a crime.

3.2.3 No *First Amendment information* other than *incidental references* shall become part of any investigative file unless some nexus is established showing that criminal conduct is being sheltered under the guise of exercising First Amendment rights.

3.2.4 An investigation may be initiated without the *executive* authorization required by Section 3.1.4 (p. 16), but only if it does not continue more than [24 hours] without the review and written approval of the [section commander or equivalent] nor more than [72 hours] without the *executive* authorization. A report shall be submitted to the *executive* detailing the basis, purpose and methods of the initial investigation and

1. Reasonable suspicion is the belief of a reasonably prudent person under the circumstances, based on specific and articulable facts, that investigation should be made to determine whether "probable cause" exists to justify an arrest, a warrant or other appropriate police action. "Reasonable suspicion" is less than the "probable cause" required for an arrest or a warrant, but is an objective standard rather than a subjective "good faith" belief.

any particulars in which it is, or has been, *directed toward First Amendment conduct.* If the *executive* does not authorize an investigation in accordance with 3.1.4, the report shall be *purged.*

3.2.5 When the police learn of the advocacy of the use of unlawful force or violence in furtherance of political, religious or other First Amendment ideas, the police may conduct a brief preliminary inquiry as follows:

3.2.5.1 The sole purpose of the inquiry shall be to determine whether the advocacy is an exercise of the expression of ideas only, or whether the advocacy is both—

—directed to inciting or producing imminent violent conduct, *and,*

—likely to incite or produce such action.

3.2.5.2 The inquiry shall follow the same procedures as set out in § 3.2.4: [section commander or equivalent] approval within [24 hours]; detailed report to a police *executive* within [72 hours]; and termination and purging unless the *executive* authorizes a full investigation based on *reasonable suspicion* that a crime has occurred, is occurring or is about to occur.

3.2.5.3 In making the inquiry whether there is a *reasonable suspicion* that a crime has occurred, is occurring or is about to occur, the inquiry shall focus on whether there are facts indicating that the *person* is currently engaged in conduct preparing for the imminent use of force or violence. Ideological rhetoric is relevant but cannot be the sole basis for a full investigation or for repeated preliminary inquiries. A full investigation shall not be authorized of a person or group which only advocates the use of force without currently engaging in actions that make violence a credible threat.

3.3 *Dignitary Protection Investigations.* Any dignitary protection investigation that is *directed toward First Amendment conduct* must comply with Part 3.1 (p. 14), and also with the following:

3.3.1 It shall be conducted solely for the purpose of ensuring the physical safety of a visiting public official or other dignitary. It shall commence only after police learn of an anticipated visit, and shall cease upon the visitor's departure or upon notice that the visit will not occur.

3.3.2 A dignitary protection investigation that is *directed toward First Amendment conduct* shall not be conducted unless the appropriate police *executive* certifies in writing that there is a *reasonable suspicion* that the subject(s) of the investigation poses a threat to the physical safety of the dignitary. The certification shall detail the specific and articulable facts upon which the *reasonable suspicion* is based.

3.3.3 All dignitary protection investigations shall be supervised by one police unit designated by the Superintendent. Information gathered shall be kept by that unit in dignitary protection files separate from all other police investigative files.

3.3.4 *Security* of *First Amendment information* shall be maintained, except that information needed to ensure the dignitary's physical safety may be disseminated to the dignitary and to other law enforcement personnel assigned to protect the dignitary.

3.3.5 If the dignitary protection investigation uncovers *reasonable suspicion* of criminal activity, the information concerning that activity may be transferred to an appropriate police unit for a criminal investigation. If the criminal investigation is *directed toward First Amendment conduct,* it shall be conducted in accordance with Part 3.2.

3.3.6 Nothing in this Part 3 restricts the on-view enforcement activities of plain clothes officers in connection with dignitary protection.

3.4 *Public Gathering Investigations.* Any *public gathering* investigation must comply with Part 3.1 (p. 14), and also with the following:

3.4.1 *Definition. Public gathering* means:

3.4.1.1 any gathering of *persons* in a public place, or in a place to which the public has reasonable access, for which a permit or notice to police or other government officials is required by legislation; or,

3.4.1.2 any march, demonstration, or rally in a public place, or in a place to which the public has reasonable access, that is reasonably likely to significantly affect traffic or public health or safety.

3.4.2 A *public gathering* investigation shall be conducted solely for the purposes of preventing substantial interference with traffic in the area contiguous to the *public gathering*, ensuring adequate public services to protect public health and safety in accordance with applicable penal and regulatory statutes and ordinances, and protecting the exercise of constitutional rights.

3.4.3 All *public gathering* investigations shall be supervised by one police unit designated by the Superintendent. Information gathered shall be kept in *public gathering* files separate from all other police investigative files.

3.4.4 A *public gathering* investigation may be initiated without the written authorization required by 3.1.4 (p. 16), but without such authorization may only:

3.4.4.1 gather published announcements of future *public gatherings* and permit applications in the form specified by City ordinance; and

3.4.4.2 communicate overtly with the organizers of the *public gathering* concerning the number of *persons* expected to participate and similar information about the time, place, and manner of the gathering that is necessary for the purposes stated in 3.4.2 above.

3.4.5 No further information may be gathered unless there is *reasonable suspicion* that the *public gathering* is likely to produce an imminent and substantial breach of the peace or riot or that the information on a permit application is false, and unless the further investigation is authorized pursuant to 3.1.4 (p. 16). The authorization shall certify the specific and articulable facts upon which the *reasonable suspicion* is based. The investigation shall not gather information about the identity of individual participants in the *public gathering* or about the content of the program unless there is compelling necessity to do so.

3.4.6 *Security* of all *First Amendment information* shall be maintained. However, it may be disseminated on a need-to-know basis to governmental agencies whose services will likely be needed or directly affected by the *public gathering*, provided they agree to make no further dissemination and to destroy the information within [30 days] after the gathering occurs.

3.4.7 If the *public gathering* investigation uncovers *reasonable suspicion* of criminal activity, the information concerning that activity may be transferred to an appropriate police unit for a criminal investigation. If the criminal investigation is directed toward First Amendment conduct, it shall be conducted in accordance with Part 3.2.

3.4.8 Police presence at a *public gathering* shall be no greater in nature and extent than reasonably necessary to enforce the criminal laws, to protect the exercise of constitutional rights, to prevent substantial interference with traffic and to protect the public health and safety in accordance with applicable penal and regulatory statutes and ordinances. The police presence shall be planned and organized to avoid discouraging *persons* from lawfully participating in the *public gathering*. The police presence may include plain clothes officers who are present solely for on-view enforcement purposes, as observers and not as participants except in the carrying out of authorized intrusive investigations under Part 3.6 (p. 27).

3.5 *Regulatory Investigations.* Any regulatory investigation that is *directed toward*

*First Amendment conduct* shall comply with §§ 3.1.1—3.1.3 (p. 14), and with the following:

3.5.1 It shall be conducted solely for the purpose of fulfilling regulatory responsibilities as set forth by statute or ordinance (such as processing license applications or conducting traffic accident and missing person investigations).

3.5.2 The requirements of §§ 3.1.4—3.1.7 (p. 16) do not apply where *First Amendment information* is incidental to the regulatory investigation, such as information that a church vehicle is involved in a traffic accident. However, these requirements must be complied with whenever *First Amendment information* is a significant focus of a regulatory investigation. In this event, security of *First Amendment information* shall be maintained.

3.6 *Intrusive Methods.*

3.6.1 *Definitions. Intrusive method* means any of the following:

3.6.1.1 An *informant,* which means an *agent* who collects information without disclosing to the source his function as an *agent;*

3.6.1.2 An *infiltrator,* which means an *informant* who is, or poses or acts as, a member or participant in a group or organization without disclosing to the group or organization and to its members his function as an *agent;*

3.6.1.3 electronic surveillance or eavesdropping of any kind;

3.6.1.4 a mail cover (acquiring information from the outside surface of mail);

3.6.1.5 a *nonconsensual entry or seizure,* which means an *agent's* entry onto a *person's* premises, or acquisition of a *person's* private papers, mail or effects or their contents, without a judicial warrant or the *person's* prior express consent given with knowledge of the *agent's* function as an *agent.* Private papers include all papers that a *person* has not made available to the general public.

3.6.2 A police investigation may use an *intrusive method* that is *directed toward First Amendment conduct* only under the following conditions:

3.6.2.1 Other methods are insufficient to effectively obtain information necessary to the investigation;

3.6.2.2 The police *executive's* written authorization under § 3.1.4 (p. 16) specifically permits the use of the *intrusive method* and explains why it is justified;

3.6.2.3 The details of the method's use, including all *First Amendment information* gathered, are fully documented for review;

3.6.2.4 Judicial warrants are obtained for any *nonconsensual seizure* of *First Amendment information,* including such seizures by *informants* and *infiltrators;*

3.6.2.5 The use of electronic surveillance or mail cover is in compliance with applicable state and federal statutes and regulations; and

3.6.2.6 Every *informant* or *infiltrator* is instructed as to the binding effect of the prohibitions of Part 2 (p. 13) and the duties under §§ 3.1.1 and 3.1.2 (p. 14) to avoid or minimize any impact on *First Amendment conduct.*

3.6.3 *Infiltration* of a group or organization engaged *in First Amendment conduct* is permitted only if it meets the requirements of 3.6.2, and in addition:

3.6.3.1 there exists *reasonable suspicion* that a crime has occurred, is occurring or is about to occur, and additional information from a reliable inside source is necessary to prevent serious injury to the public or to assure identification and apprehension of the persons engaging in criminal conduct.

3.6.3.2 the Superintendent of Police personally approves the *infiltration* in writing, by a certification that particularly describes the group to be infiltrated; the crime which has been, is being or is about to be committed by the group or its members; the reasons why it could not be prosecuted or prevented

without the *infiltration;* and the *minimization* procedures to be used by the *infiltrator;*

3.6.3.3 the scope and conduct of the *infiltration* is limited to the specific crime that is suspected, and no *First Amendment information* (other than *incidental references* ) is gathered; and

3.6.3.4 the *infiltration* does not continue unless recertified by the Superintendent in the same manner as originally, at intervals of not more than [30 days].

3.6.4 While it is the intention of the parties that the requirements of this Part 3.6 be enforceable both as an injunction and through departmental discipline, it is *not* the intention of the parties that Part 3.6 create any right to the exclusion or suppression of evidence in a criminal prosecution.

## 4. IMPLEMENTATION OF THIS JUDGMENT

4.1 The Police Department shall adopt and maintain Department-wide administrative regulations implementing this Judgment (after notice to and consultation with counsel for the plaintiffs). The Department may modify such regulations from time to time, but only after reasonable notice to, and consultation with, the Chicago Police Board and counsel for the American Civil Liberties Union and the Chicago Committee to Defend the Bill of Rights. All such regulations shall be consistent with this Judgment. Violations of such regulations, including by supervisory personnel, shall subject the violator to Departmental discipline.

4.2 All current employees of the Police Department, and all future employees at the time of their hiring, shall be served with a copy of this Judgment. Training with respect to the requirements of this Judgment and the implementing regulations shall be provided:

4.2.1 to new recruits as part of the Police Academy curriculum; and

4.2.2 on a continuing, in-service basis to personnel of the Bureaus of Inspection-

al, Investigative and Community Services, all district tactical units, and all other units likely to engage in *investigative activity* covered by this Judgment.

4.3 All employees of the City of Chicago shall be given notice of this Judgment once every five years, in the form of the summary attached hereto as Appendix D, through enclosure in pay envelopes or a similar method. New employees, at the time of their employment, shall be furnished with a copy of the same notice.

4.4 The Superintendent of Police shall annually conduct a departmental audit of the implementation of and compliance with this Judgment and the regulations adopted under § 4.1, and submit the audit report to the Mayor, the Police Board, and this Court for filing as a public record. The annual report shall include the number of authorizations issued under parts 3.2—3.5, respectively; the number of infiltration approvals given under § 3.6.3; a statistical analysis of the purposes for which authorizations and approvals were granted, the types of unlawful activities involved, the number of arrests and prosecutions based on such investigations, and other meaningful information; a summary of any internal disciplinary complaints concerning compliance with this Judgment or the related Departmental regulations and the findings made and actions taken on such complaints; and a description of other actions taken to implement this Judgment. The Superintendent's report shall not give information that would identify criminal informants or current sensitive criminal investigations, designated by the Superintendent, that might be compromised by disclosure.

## 5. AUDITING AND MONITORING IMPLEMENTATION OF AND COMPLIANCE WITH THIS JUDGMENT

5.1 The Chicago Police Board shall have the following functions:

5.1.1 To audit, monitor and evaluate compliance with this Judgment, and with administrative regulations adopted pursuant to the Judgment, and to

report to the Mayor, the Superintendent of Police and the public concerning its findings.

5.1.2 To consult with and make recommendations to the Mayor, the Superintendent, and other appropriate executive branch officials, from time to time, concerning the implementation and functioning of this Judgment, both to effectuate the purposes of the Judgment and to simplify its administration.

5.2 The Board shall conduct audits and inquiries appropriate to its responsibilities concerning this Judgment. In particular, it shall cause management audits to be conducted, by a national independent public accounting firm, of the implementation of and compliance with this Judgment and the regulations adopted under § 4.1. The audit report shall include a description and evaluation of such implementation and compliance, as well as a discussion of any substantial violations observed or detected and any recommendations for improvement of performance that the auditors deem appropriate. Such audits shall be conducted in 1982, 1984, and thereafter at intervals of not more than five years. The audit report shall be made public, along with any report or recommendations which the Board, the Superintendent or the Mayor wishes to issue. The Board may make and may publish such other reports and recommendations as it deems necessary.

5.3 The Board and the management auditors, for the purposes of § 5.1 and 5.2, shall have access to all relevant data in the possession of the city, including without limitation complete documentation of all investigations, except as provided in this paragraph. The auditors shall not have access to information specifically identifying criminal informants, or to current sensitive criminal investigations designated by the Superintendent that might be compromised by disclosure to the auditors (but all documentation of such investigations shall be retained under § 3.1.7 to be audited after termination of the investigation.) The auditors shall not disclose any information to anyone but the Board, or to the Superintendent of Police upon his request.

5.4 The Board shall have the following duties and limitations concerning the disclosure of information obtained from City agencies:

5.4.1 The Board shall not disclose, in any manner, details that specifically identify any investigations, except as provided in § 5.4.3. However, it may disclose general policy and performance data concerning the implementation of and compliance with this Judgment and the regulations, including paraphrased examples of investigations.

5.4.2 The Board shall not disclose, in any manner, information that would reveal the identity of a criminal informant, compromise an ongoing criminal investigation, or constitute an invasion of a person's privacy.

5.4.3 If the Board learns of any substantial violation of this Judgment, it shall promptly notify the Superintendent of Police (or the Office of Municipal Investigations if the matter involves personnel of a City agency other than the Police Department.) The official notified shall report back to the Board within 30 days what investigation was made and what corrective action was taken.

## 6. INDEX TO DEFINITIONS.

6.1 Definitions appear at appropriate points in the text as follows:

| Term | Section | Page |
| --- | --- | --- |
| Directed toward | 1.3 & 1.4 | p.11 |
| Executive | 3.1.4 | p.16 |
| First Amendment conduct | 1.5 | p.11 |
| First Amendment information | 1.6 | p.13 |
| Incidental references | 1.4 | p.11 |
| Infiltrator | 3.6.1.2 | p.27 |
| Informant | 3.6.1.1 | p.27 |
| Intrusive method | 3.6.1 | p.27 |
| Investigative activity | 1.2 | p.10 |
| Minimization | 3.1.2 | p.15 |
| Public gathering | 3.4.1 | p.23 |
| Purging | 3.1.7 | p.17 |
| Reasonable suspicion | 3.2.2 | p.19 |
| Security of information | 3.1.6 | p.17 |

6.2 *Additional Definitions.*

6.2.1 *Agent* means any officer or employee of the City of Chicago; or any person paid, controlled, or directed by an officer or employee of the city; or any person who is requested by an officer or employee of the city to engage in *investigative activity.*

6.2.2 *Person* means any individual, group of individuals, or organization.

6.2.3 *Record* means any physical or electronic method of retaining information.

## II. RETENTION OF JURISDICTION AND ANCILLARY MATTERS

A. *Retention of Jurisdiction by the Court.* Jurisdiction is retained by the Court for the following purposes.

1. To enable the parties to this Order to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Order, for the enforcement of compliance with the provisions contained herein, and for the punishment of the violation of any such provisions. Application to enforce such provisions or to impose punishment for any such violation may be presented to this Court by any person affected by the conduct complained of. Prior written notice of all such applications and other matters in this action shall be given to counsel for the named parties hereto. Except where emergency relief is sought, seven days written notice shall be given.

2. For the trial and adjudication of the damage claims against the City defendants.

3. The parties recognize that modification of certain procedural provisions of Part III (time periods and specification of authorizing police personnel) may be warranted in the future, on the basis of experience with implementation and administration of this Judgment. Those provisions are set off in brackets in the text of Part III.

Accordingly, after five years from the entry of this Order, the City of Chicago may undertake such modification in the following manner:

a. The City shall serve the proposed modification of the bracketed provision(s) upon counsel for the named plaintiffs, together with a detailed statement of the reasons why the modification is warranted.

b. The parties shall consult for a period of 60 days to determine if the modification can be made by agreement.

c. If agreement is not reached the City may file its proposed modification and statement with the Court, and if no objection is filed by the named plaintiffs the modification shall take effect 30 days after filing.

d. If the named plaintiffs file written objection to the proposed modification within 30 days, the Court shall determine whether the modification should be approved. The Court should approve the modification unless it does not meet the following standards:

i) it facilitates police administration;

ii) it is calculated to effectuate and not to thwart the basic purpose of this Judgment;

iii) it is consistent with the substantive and the remaining procedural provisions of this Judgment; and,

iv) it maintains or increases the effectiveness of the procedure it replaces, provided that an increase of a time period or a decrease of command level for an authorization shall not *per se* be considered less effective.

B. *Final Disposition of Claims for Injunctive Relief Against City Defendants.* This Agreed Order, Judgment and Decree constitutes the final disposition of the claims for injunctive relief against the city defendants. The Court expressly finds and determines, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay and directs that this Judgment be entered forthwith.

C. *Ancillary Matters.*

1. The Chicago Police Department intelligence files held in the document depository at Police Headquarters pursuant to this Court's orders of October 14, 1976, and May

4, 1977, shall be retained in the depository under the terms of those Orders until the final disposition of the damage claims against the city defendants and of all claims against the federal defendants, and their status thereafter shall be determined by future order of Court.

2. Plaintiffs will petition the Court to determine whether and in what amount fees and costs will be awarded with respect to the matters resolved by this Agreed Order, Judgment and Decree. Defendants will file objections. The parties have made no agreement with respect to these questions.

## APPENDIX A

### TO AGREED ORDER, JUDGMENT AND DECREE

The following are the named Plaintiffs who have consented to the entry of the Agreed Order, Judgment and Decree in the three cases cited below:

*NO. 74 C 3268:* Alliance to End Repression
Chicago Area Unitarian Universalist Council
Chicago Committee to Defend the Bill of Rights
Chicago Heights Unitarian Universalist Community Church
Chicago Peace Council
Clergy and Laity Concerned
Ethical Humaninist Society of Chicago
First Unitarian Church of Chicago
Near North Fellowship
Wheadon United Methodist Church
Women's International League for Peace and Freedom
Young Workers Liberation League
Richard Criley
Dennis Cunningham
Courtney Esposito
Janice Gutman
Jeffrey Haas
John Hill
Rev. William Hogan
John Kearney
Liza Lawrence

Sidney Lens
Rev. Jack Mendelsohn
Lucy Montgomery
Joe Petzel
A.A. Rayner, Jr.
John Rossen
Jay Schaffner
Jack Spiegel
G. Flint Taylor

NO. 75 C 3295: American Civil Liberties Union
American Friends Service Committee
Better Government Association
Community Renewal Society
Independent Voters of Illinois
League to Improve the Community
Medical Committee for Human Rights
Organization for a Better Austin
People United to Save Humanity
Roger Baldwin Foundation of ACLU, Inc.
Paul Booth
Ronald J. Clark
Leon Despres
Ronald Dorfman
Jesse L. Jackson
Ralph Knoohuizen
Peter Kuttner
G. Marie Leaner
David McLendon
Don Rose
Augustus Savage
Jeffery Schnitzer
Dick Simpson
Quentin Young

NO. 76 C 1982: Chicago Lawyers' Committee for Civil Rights Under Law, Inc.

## APPENDIX B

### TO AGREED ORDER, JUDGMENT AND DECREE

The classes represented by the named Plaintiffs in *Alliance to End Repression, et al. v. City of Chicago, et al.,* No. 74 C 3268, and in *ACLU, et al. v. City of Chicago, et al.,* No. 75 C 3295, as certified by District Court Orders on March 25, 1976 and May

24, 1976, respectively, and affirmed by the Seventh Circuit Court of Appeals on November 22, 1977 (565 F.2d 975), are as follows:

1. *Alliance Classes* (as first alleged on November 13, 1974)

a. The Plaintiff Individuals:

The class represented by plaintiff individuals consists of all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage in or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

b. The Plaintiff Organizations:

The class represented by plaintiff organizations consists of all organizations located or operating in the City of Chicago who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been within the last five years, are now or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, photographic, electronic, or physical surveillance, summary punishment, harassment, or dossier collection, maintenance, and dissemination by defendants or their agents.

2. *ACLU Classes*

a. The Plaintiff Individuals:

The class represented by plaintiff individuals consists of all residents of the City of Chicago, and all other persons who are physically present within the City of Chicago for regular or irregular periods of time, who engage in or have engaged in lawful political, religious, educational or social ac-

tivities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents.

b. The Plaintiff Organizations:

The class represented by plaintiff organizations consists of all organizations located or operating in the City of Chicago who engage or have engaged in lawful political, religious, educational or social activities and who, as a result of these activities, have been, are now, or hereafter may be, subjected to or threatened by alleged infiltration, physical or verbal coercion, surveillance, or dossier collection, maintenance, and dissemination by defendants or their agents.

APPENDIX C

TO THE AGREED ORDER, JUDGMENT AND DECREE

The following are the named City Defendants who have consented to the entry of the Agreed Order, Judgment and Decree in the three cases cited below:

No. 74 C 3268: The City of Chicago
Richard Brzeczek
Walter Murphy
John Doe
Richard Roe
Joe Grubisic
Maurice J. Dailey
R. Vaisvilas
R. Bock
William L. Vick
Terrence Fahey
John T. Stibich
Leroy Privoznik
James J. Cunningham
Donald Cowen
Lovejoy Foster
Peter Rivera
Morgan Mitchem
Kenneth Moranz
Ricardo Abreu
Truman Stromberg

Anthony Romano
Louis Cuddy
Mort Frankin (misnamed Mort Franklin in Complaint)
Thomas Kinsella
Peter Schurla
Howard Pointer
James E. Kostro
Elgia C. Cook
Samuel Babich
Andrew Rodriguez
David Cushing
Thomas McDermott
T. O'Connor
William Benes
Kenneth Carcerano
Eugene Hill
John Ritenour
George Patton
Earl Armstead
Albert Jordan
Earl Nevels
James Tobin
Toby Burton
Michael Fera
Milton Carson
R. Sieczkowski
Vito A. Clesceri
J. Des Enfants
F.O. Bonke
Walter Biszewski
Jesse Resendez
L. Struck
L. Boston
John Philbin
Milton Smith
Jacob Bouyer
William McWhinney
Daniel Kentala
Marcus Salone
Cory Daniel Chan
Thomas Czapiewski
Melvin C. Barna
Robert Putill
Clarence Williams
John Valkenberg
Alfredo Vallejo
William Olson

James Conlisk, III
Robert Osmondson
James Grant
Emmett Ebert
Harry L. Anderson
Unknown agents of the Chicago Police Department
Wilbur Daniel
Saul Epton
Norval Morris
Justin A. Stanley
Ann Ida Gannon
Nancy Jefferson
Marshall Korshak
David Cintron
Frances Zemans
Jane M. Byrne

No. 75 C 3295: The City of Chicago
Jane M. Byrne
Richard Brzeczek
Wilbur Daniel
Saul Epton
Norval Morris
Justin A. Stanley
Ann Ida Gannon
Nancy Jefferson
Marshall Korshak
David Cintron
Frances Zemans
Walter Murphy
Joseph Grubisic
John Doe's # 1–75
Howard Pointer
Marcus Salone
Melvin Barna
James Kostro
James T. Fitzgibbons
James Tobin
Raymond Vaisvilas (misnamed Raymond Vace in Complaint)
Maurice J. Dailey (misnamed Patrick Maurice Daley in Complaint)
Morton Frankin (misnamed Morton Franklin in Complaint)

No. 76 C 1982: The City of Chicago
Jane M. Byrne
Richard Brzeczek
Wilbur Daniel

Saul Epton
Norval Morris
Justin A. Stanley
Ann Ida Gannon
Nancy Jefferson
Marshall Korshak
David Cintron
Frances Zemans
Walter Murphy
Joseph Grubisic

NOTE: Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, the following public officers have been substituted as defendants in place of their predecessors in office: Jane M. Byrne, Mayor of the City of Chicago; Richard Brzeczek, Superintendent of Police of the City of Chicago; and Saul Epton, Norval Morris, Justin A. Stanley, Ann Ida Gannon, Nancy Jefferson, Marshall Korshak, David Cintron and Frances Zemans, members of the Police Board of the City of Chicago.

The following City Defendants are not included in the above lists because they are not currently employees or agents of the City of Chicago and are therefore not in a position to consent to injunctive relief concerning City activities:

74 C 3268: James M. Rochford
Mitchell Ware
R. Zagotta
Otto Kral
Leason Linzy
Burton Lovely
Joseph Arquilla
Anthony Jablon
John O'Brien
Joseph Ternes
Martin Walsh
Terrence J. Knox
James Nolan
John Burian
Frank Baxter
Jerroll Pope
Irwin Bock
Thomas West

Eugene Dorneker
John Hastings
Geno Addams
Michael Randy
David LeMarc
Roy Robinson
Albert J. Heitman
Adele Noren
Sheli Lulkin

75 C 3295: James Rochford
Mitchell Ware
John Clarke
James Nolan
Thomas S. McInerney

76 C 1982: Mitchell Ware
James Rochford

APPENDIX D

## TO THE AGREED ORDER, JUDGMENT AND DECREE

### LEGAL NOTICE TO ALL EMPLOYEES OF THE CITY OF CHICAGO

By the consent of the City of Chicago, the United States District Court has entered an order, dated _____ , 19__, protecting the rights of individuals and groups to speak out, to petition the government, and to associate in the furtherance of economic, political, and religious objectives as provided by the first amendment of the U.S. Constitution. No investigation, collection of information, or other action may be taken against individuals or groups exercising such rights except under exceptional circumstances for legitimate governmental reasons. The Court order provides that any investigation concerning activities protected by the first amendment must follow specified procedures. Most of these matters are properly handled by the Department of Police, but you are advised that the Court order also binds all City employees and agents so far as investigation or other action taken against individuals or groups exercising such rights.

_____
Judge, U.S. District Court